JONES *v.* STATE.

(In Banc.   May 24, 1937.   Suggestion of Error Overruled June 23, 1937.)

[174 So. 546.   No. 32550.]

**L. P. B. Lipscomb**, of Indianola, for appellant.

Neill & Townsend, of Indianola, and W. D. Conn, Jr., Assistant Attorney-General, for the State.

Argued orally by **S. D. Neill,** for the State.

**Ethridge, J.,** delivered the opinion of the court.

Robert Jones, appellant, was indicted at the September, 1936, term of the circuit court of Sunflower county for the murder of one George Dodd, was tried, convicted and sentenced to be hanged, and appeals to this court.

The killing occurred, after dark, outside the Baird store in the town of Baird, Miss. It appears that appellant had been drinking and cursing in and around the store on the evening in question, and that he had a pistol;

that the deceased, George Dodd, who seems to have been the manager of the plantation upon which the appellant worked, went out to where the appellant was and demanded that he surrender his pistol, and that three shots were fired, two from the appellant's pistol, a Smith & Wesson special, and one from the pistol of George Dodd, which was a Colt pistol, both being .38 caliber, but having a difference in the character and size of the bullets. It seems that just prior to the shooting some one had called the appellant out of the store and that they had gone a few feet from the end of the store when George Dodd walked out and the other party retreated behind the store. None of the witnesses testified to hearing the statement alleged to have been made by George Dodd that appellant surrender his pistol, and these witnesses said that the first thing that attracted their attention was the shooting. The bullet which killed Dodd entered his left front side, ranged down four or five inches, and then came out through his right side under his right shoulder blade. The bullet was found near where the body fell, and was a .38 Smith & Wesson bullet sightly battered. Appellant was wounded in the leg, and, after the shots were fired, he picked up the pistol of the deceased, and carried it, with his own, into the store and turned both over to Mr. Baird. Appellant was then placed under arrest, and, while being carried to jail, the deputy sheriff asked appellant why he killed Dodd, and appellant stated that he did not know unless he was scared. The deputy sheriff testified that he had twenty years' experience in the use of firearms, and that there was a difference in the bullets of the two pistols, and that the bullet found was from a Smith & Wesson pistol.

The appellant, in his own behalf, testified as follows, that while he had been drinking he was not drunk, and that while he had cursed he was not mad, that he was trying to shame his nephew who was in a fuss with another party, and that John Allen called him out, and

that Mr. Dodd came out and said, "Give me that gun" and that appellant said, "Oh, Mr. Dodd, I am not doing anything wrong;" that Mr. Dodd said, "Are you going to give it to me," and appellant said, "Yes sir." Appellant then testified that, "He lifted his hand through here (indicating) and got it right here (indicating) and I said 'Oh, Mr. Dodd,' and he stuck it in my stomach like that (indicating) and that was when I got shot through the leg, and I jumped, and being easy on the trigger just like that (indicating) and I fell and when I fell that is how it was." Here the jury was taken into a room to view appellant's leg, and when the jury returned, the appellant was further examined as follows;

"Q. Now Robert, where did that bullet go in? A. Right there (indicating).

"Q. Where did it come out? A. It come out right there (indicating).

"Q. What was it you did when Mr. Dodd cocked his pistol? A. I said, 'Oh, Mr. Dodd, yes, I will give it to you.' He asked me was I going to give it to him, and he pulled it out and headed it into me, and I pushed it down and I jumped when the pistol fired, I imagine my pistol fired too fast, I don't remember. The only thing I remember was I was falling."

On cross-examination he said, in answer to questions, as follows:

"Q. You had a .38 Smith & Wesson special? A. Yes sir. . . .

"Q. When Mr. Dodd fell; you picked up his pistol? A. I don't remember. When he shot the smoke blinded me from seeing. . . .

"Q. You and he (John Allen) were just back of the coal house? A. I was about eight feet behind or beyond the corner of the coal house, I imagine about that distance.

"Q. Mr. Dodd fell right opposite the corner of the coal house, didn't he? Isn't that where all the blood

was? A. Lawyer Niell, I doesn't know. When I got up, I got up trying to go in the store.

"Q. Mr. Dodd came down there and put a gun on you and told you to give him the pistol? A. Yes sir.

"Q. You had that pistol out up there prior to that time? A. No sir.

"Q. You never had it out? A. No sir.

"Q. How did Mr. Dodd know you had a pistol? A. I suppose somebody in the family told him.

"Q. How did they know? A. My family knowed I had it.

"Q. He told you to give him that pistol? A. Yes sir.

"Q. When you came out with it . . . he didn't shoot? A. No sir.

"Q. He was falling, or were you falling, which was it? A. When he stuck it to me, I said, 'Oh, Mr. Dodd,' and I jumped, my pistol being very easy when he shot 'bum,' I was scared.

"Q. You were so scared you shot him twice? A. I was falling on the ground.

"Q. What is your height? A. Six feet four inches.

"Q. What was Mr. Dodd's height? A. I couldn't say. . . .

"Q. Explain how, if you were falling when you hit him, your bullet hit him under the arm here and came out under the shoulder blade in the back? Can you explain that? How did that bullet get down there nearly four inches unless you were standing perfectly straight when you shot him? A. We was standing.

"Q. Were you standing straight? A. Yes sir, I was standing straight.

"Q. Then you were not falling when you shot him, if you were standing straight? . . . A. I don't remember the first shot. I didn't know I had fired the first time.

"Q. Were you drunk? A. No sir, I wasn't drunk.

"Q. Had you been drinking? A. Yes sir I had a drink, but Mr. Dodd give me that. . . .

"Q. He was standing up, as you were and the position he was in you were tall enough to shoot him so the bullet ranged just as the witnesses testified? A. Yes sir, I was standing up.

"Q. Your height and his height, that made the bullet range just as these witnesses testified? A. That is as near right as I can say.

"Q. Now, isn't it a fact that you had your pistol in your bosom and didn't you tell Mr. Wes Watkins and others that you had it in your bosom? A. Yes sir, I had it in my bosom when I was fixing to get in the wagon.

"Q. Did you take it out of your bosom and put it in your pocket at the time you saw Mr. Dodd coming? A. No change.

"Q. Did you change it from your bosom from the wagon until you got to the corner of the coal house? A. No sir. That was done at the wagon.

"Q. Was that after the time you changed it when you told Roger Dyson what he testified here? Was that when you made the change? A. Yes, sir, I made the change then.

"Q. You made the change at the wagon? A. Yes sir, John Allen called me. . . .

"Q. Up to that time he (Dodd) hadn't cocked the pistol at you, he had just pointed it at you and told you to give it to him? A. Yes, sir, he walked toward me and cocked the gun and told me was I going to give him the gun. Let me explain—

"Q. Go ahead. A. When he throwed the pistol on me he said 'give me that gun' and I said, 'Oh, Mr. Dodd, I haven't done any wrong.' I turned this way (indicating) and he said, 'Ain't you going to give it to me' and I said 'yes sir' and made it down here (indicating), that time he cocked his pistol, thinking I was going to shoot him.

"Q. You evidently had your hands on the trigger?
A. I must have had it on the trigger, but I don't remember. . . .

"Q. The pistol you picked up was Mr. Dodd's? A. Yes sir. . . .

"Q. Do you mean to tell the jury you were so drunk you didn't know what was done? A. I didn't say drunk.

"Q. You said you didn't know what you were doing, what caused you not to know what you were doing? A. I was scared of getting shot."

It will be seen from these statements that the appellant had been drinking and cursing and that when Mr. Dodd went out to where the appellant was that none of the witnesses, although they were within a few feet, heard any of the conversation testified to by the appellant, and their attention was first attracted by the three shots, two of which were fired from appellant's pistol. It will also be seen that the appellant first said he was falling when he fired these two shots, and he afterwards retracted that statement and said he was standing straight. The appellant was taller than the deceased, and this fact, in connection with the range of the bullets, demonstrated that appellant was standing straight and not falling. It will also be noted that, when questioned about it, he stated that he did not know why he shot unless he was scared. These statements, coupled with the fact that the appellant shot twice and the deceased only once, warranted the jury in reasonably inferring that appellant began the difficulty and that there was no colloquy when Dodd came up, and in disbelieving the appellant's version as to what took place.

The main assignment of error is that the evidence is insufficient to convict the appellant of any crime, especially murder. The rule that the testimony of the appellant, the only account of the killing, must be accepted, is subject to the further rule that such evidence must be reasonable within itself, and not contradicted by

other facts and circumstances. In the case at bar the evidence of the appellant is contradicted by the fact that two witnesses very close by did not hear any of the conversation alleged to have taken place.

The facts that the appellant killed Dodd with a deadly weapon, and that there were two shots fired by the appellant, would supply a presumption of malice, thus warranting the jury in believing that appellant shot Dodd maliciously and without legal justification.

The appellant requested a peremptory and also a charge to the jury that it must confine its consideration as to guilt or innocence to a charge of manslaughter alone, and the court granted to the appellant the following instruction:

"The court instructs the jury that every person who shall unnecessarily kill another while resisting an attempt by such other person to commit or to do an unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter, therefore, if you believe from the evidence heard in this case that the deceased was attempting to unarm the defendant, he was guilty of an unlawful act and if the defendant shot the deceased, either at the time of the commission of the act, or after such attempt shall have failed, he can be guilty of no more than manslaughter, but in order to return such a verdict, you must be convinced of this beyond every reasonable doubt and to a moral certainty, and by such a verdict you must also say that considering the facts and circumstances that surrounded the defendant at the time of the killing that the defendant had no reason to believe that he was in danger of great bodily harm or the loss of life at the hands of the deceased."

We are of the opinion that the jury was not limited to manslaughter in its consideration of the evidence, and that the evidence warranted the jury in finding the appellant guilty of murder, and that the appellant was given liberal charges to the jury by the court below, and that his rights were fully considered and the law upon the

subject applied. It was not unlawful, per se, to attempt to disarm a drunk man who was disturbing the peace.

We find no reversible error that would warrant us in reversing the cause, and the judgment of the court below is affirmed and Thursday, July 1, 1937, fixed as the date for execution of the sentence.

Affirmed.

### DISSENTING OPINION.

**Griffith, J.,** delivered a dissenting opinion.

After a careful examination of this record, one which is unsatisfactory at best, and in which every doubt has been resolved against the appellant instead of in his favor, I do not think the actual facts, so far as this attenuated record discloses them, can be justly made to sustain a conviction of a higher offense than manslaughter; and without entering into any discussion of the details or attempting to point out wherein the majority opinion, as it seems to me, goes too far, I desire only to place of record the fact that I do not share in any responsibility for the execution ordered by the court in this case.

**Judge Anderson** joins me in this dissent.