534 So.2d 168 (1988)
Allen NICOLAOU
v.
STATE of Mississippi.
No. 58000.
Supreme Court of Mississippi.
October 26, 1988.
James G. Tucker, III, Bay St. Louis, for appellant.
*169 Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ANDERSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Allen Nicolaou appeals from his conviction in the circuit court of Hancock County of capital murder and as a habitual offender, and sentence to life imprisonment without parole. We find most of his assignments of error of no merit. Because the circuit judge gave the jury, after it retired to reach a verdict, a definition of "malice aforethought" which we find confusing, we reverse and remand.

FACTS
Don L. Michael Anderson, a telephone employee and part-time deputy sheriff of Hancock County, was acting as dispatcher at an understaffed and undermanned jail on Saturday, October 27, 1984. He filled two shifts that day, eight-to-four, and four-to-midnight. He was also the only person on duty in the jail and sheriff's office that day. There were thirty-five prisoners in jail.
At ten that night Larry Williams, a trusty, came to the intercom on the first floor, and called Anderson, notifying him that a prisoner in cell Number One on the second floor was not breathing. Cell Number One on the second floor housed two prisoners, the other two cells on the second floor housed ten men each.
Deputy Sheriff Leo Ladner was then in the building, and Anderson called to him that he had to go upstairs. Anderson got the keys, and as he was going into the jail John Wilkerson of the Waveland Police Department was bringing a prisoner to jail. This prisoner was put in a cell, and then the three officers, Ladner, Wilkerson and Anderson went upstairs to cell Number One.
The officers found Charles Alan Poole lying on the bottom bunk with blood all over his face. Anderson immediately telephoned the mobile medical service.
Until summoned by Williams, Anderson had heard no disturbances during his duty hours that day.
Poole, a man approximately five feet six inches in height and weighing 150 pounds, was dead. He had been arrested on the previous Friday night, October 19, after being identified as an armed robbery suspect.
The external examination by John D. Rutherford, III, M.D., the pathologist, of Poole's corpse showed multiple abrasions on the neck and around the hands and feet, as well as an abrasion on the right forehead. Blood was clotted all over the face. The nose bridge was purple from a large hematoma and the right eye was black.
There was evidence Poole had been tied or bound by the legs just above the ankles causing large areas of purple discoloration, as well as having been bound at the wrists, causing the hands to be purple. The pathologist was of the opinion the bones in the nose had been crushed. Blood exuded from both the nose and mouth.
Dr. Rutherford's medical opinion was that the cause of Poole's death was asphyxiation, or suffocation, from obstruction of the upper airway from the bruising in the area of the vocal cords and fractured nose, that he had "drowned on his own blood." He found extensive hematomas at the back of the swallowing tube and inside the mouth, and another in the larynx area.
The only person in the cell with Poole at the time of his death was the defendant Nicolaou.
Nicolaou was indicted by the Hancock County grand jury on February 14, 1985, for capital murder committed while under two consecutive sentences of life imprisonment, in violation of Miss. Code Ann. § 97-3-19(2)(b), and as a habitual offender under Miss.Code. Ann. § 99-19-81, and brought to trial on October 30.
In addition to the facts as above set forth, Alvin Ladner, a criminal investigator with the sheriff's department, testified that when he was summoned to the jail that *170 night, he noticed that Poole had been beaten, and blood was coming from the nostrils. Ladner described the marks about the neck, ankles and wrists as being "some sort of burn marks." He also noticed blood spots on the wall of the cell.
Wilkerson testified that as he was taking Nicolaou downstairs that night, Nicolaou asked him if Poole was dead. Wilkerson replied that he thought so. Nicolaou then said that he had gone crazy and just couldn't stop, that Poole "wouldn't stop messing with me."
Nathaniel Jones, a prisoner serving a 30-day jail sentence for fighting, also testified for the State. Jones testified that with the aid of a hand held pocket mirror he watched Nicolaou and Poole fight at various times during the day of the slaying. He said Poole was tied, untied, and tied again five to eight times, and that Poole was scared of Nicolaou. On direct examination Jones testified he "knew Poole was wearing jeans." Photographs in the record, however, show Poole, was wearing an orange jumpsuit.
After the State rested, the defense first offered Harold Hiney, a deputy sheriff. He testified that he went to the cell at 9:00 p.m. and Nicolaou asked to be separated from Poole, who would not leave him alone, and would not stop getting into bed with him. Hiney also said the two of them had told him that Poole started the fight.
Alvin DeGraw, a prisoner trusty, testified that when he carried lunch to this cell Poole was tied up, and that he suggested to Nicolaou that he untie him because his hands were tied too tightly, and that Nicolaou did untie him.
Deputy Ladner was called by the defense and testified that when he saw Poole's corpse, it was not tied.
Don Lee Coss, the officer who initially arrested Poole, testified that when he arrived at the jail at 9:45 p.m. it was noisy, and he could not remember if he heard anything unusual.
George Burleson, the jailer, testified that he put Poole in Nicolaou's cell the morning of the killing so that Poole would not have to spend the weekend in "the hole." "The hole" was a cell where unruly prisoners were placed. When asked whether he said something to the effect of "let the best man win," when he put Poole in the cell with Nicolaou, he said he could not remember.
James Koch, another prisoner, testified that after Poole was moved up to Nicolaou's cell, he heard hollering and screaming.
Nicolaou took the stand in his own defense, and testified that in the week before the murder he had met Poole and that they had fought some. He said that the reason he tied Poole up was to keep him from rummaging through his personal property. He could not recall, however, what happened to cause the incident. He testified that the last thing he remembered was tying Poole up after supper.
On October 22, 1984, Nicolaou had pleaded guilty to two murders, armed robbery, and two kidnappings, for which he had been sentenced to two terms of life imprisonment, 40 years on the armed robbery charge, and 30 years on each kidnapping charge. The kidnappings were committed in connection with and following the robbery of a convenience store.
Following his trial Nicolaou was found guilty of capital murder. The circuit court then conducted the sentencing phase of his trial before the same jury, which was unable to agree upon his punishment.
The court then conducted a sentencing hearing, and under Miss. Code Ann. § 99-19-81 sentenced Nicolaou to life imprisonment without parole.

LAW
Nicolaou makes three assignments attacking the sufficiency of the evidence, the first claiming there was no proof he did not act in self-defense, the second claiming there was insufficient evidence of malice aforethought, and finally that the verdict was against the weight of the evidence.
The proof in this case showed that only Nicolaou and Poole were in the cell, and that Poole's death was not from natural *171 causes, but from violence. Whether the beating was with some instrument never found, or with hands and/or feet is unknown. The record does show that Poole was brutally and savagely beaten, and that he died as a result of the violence inflicted upon him. The evidence also showed that Poole had been tied and bound off and on during that day around his wrists and ankles. Finally, the record reveals that Nicolaou was the person who bound Poole, and inflicted the death causing injuries.
The only eyewitness to this slaying is Nicolaou. When he was being taken downstairs he asked Deputy Sheriff Wilkerson if Poole was dead, and when Wilkerson replied that he thought so, Nicolaou responded that he had gone crazy and could not stop, that Poole would not stop "messing" with him. He made no attempt to explain how Poole was "messing" with him. There was nothing about this statement to indicate that he had acted in lawful self-defense, or that Poole had committed some outrageous act justifiably provoking Nicolaou into some rage, and thereby entitling him to a manslaughter instruction. Ruffin v. State, 444 So.2d 839 (Miss. 1984); Dalton v. State, 141 Miss. 841, 105 So. 784 (1925); Miss. Code Ann. § 97-3-35 (1972).
When Nicolaou testified in his own behalf at trial, he could recall nothing that happened after supper. He testified the reason he tied Poole up was to keep him from rummaging through his personal belongings.
Counsel for Nicolaou in his brief overlooks some well-settled law. In Musselwhite v. State, 212 Miss. 526, 54 So.2d 911 (1951); and again in Talbert v. State, 347 So.2d 352 (Miss. 1977), and Terry v. State, 348 So.2d 774 (Miss. 1977), we upheld murder convictions committed by defendants who were unarmed.
The Alabama Supreme Court has set forth the rationale:
[A]s a general rule, when a person enters into combat with another, intending no more serious injury than an ordinary battery, and no weapon is used, and death ensues, the person thus causing death, if his acts were wrongful or unlawful, and nothing more appears, would be guilty of no higher grade of homicide than manslaughter in the first degree... . Still, if the force used is excessive, and the assault is brutal, malice may be inferred which would raise the grade of the offense to murder.
Diamond v. State, 219 Ala. 674, 123 So. 55, 57 (1929).
And, again in Oliver v. State, 234 Ala. 460, 175 So. 305, 309 (1937), that Court stated:
If death came from cumulative wounds and beatings so severe and so repeated as to convince the jury beyond a reasonable doubt of an intent to kill, all the elements of murder in the first degree were present. No provocation to mitigate or overcome the inference of malice, or wicked motive was shown nor claimed.
40 C.J.S., § 24, p. 874, states: "The fact that cruelty or brutality was manifested in the killing will raise an inference of malice." See also, Commonwealth v. Buzard, 365 Pa. 511, 76 A.2d 394 (1950); 22 A.L.R.2d 846; 40 Am.Jur.2d. Homicide, § 268, and cases cited.
Equally well settled is the presumption which arises from an unexplained slaying.
In McDaniel v. State, 8 Smedes & Marshall 401, 1 Mor.St.Cas. 336, 47 Am.Dec. 93 (1847), at 417, this Court set forth the governing principle:
When the fact of a killing, with all its attendant circumstances, is clearly proved, and the testimony either shows express malice, or that there was no malice at all, there is no room for presumption. But in cases where the killing is proved, and no accompanying circumstances appear in the evidence, the law presumes the killing was done maliciously. So, where the killing is proved, and the circumstances attending it are shown, though no express malice may appear from the proof, it may be presumed from some attending fact; as if a deadly weapon were used, the law presumes malice. So, if there be circumstances of barbarity and cruelty, the law presumes malice. These presumptions *172 of law, if unopposed, may amount to full proof of the fact. They stand until the contrary is proved, or until such facts are proved, as are sufficient to raise a contrary and stronger presumption.
In Green v. State, 28 Miss. 687, 1 Mor.St. Cas. 788 (1855), we approved the following jury instruction:
That every killing is presumed to be malicious, and amounting to murder, until the contrary appears from the circumstances of alleviation, excuse, or justification; and that it is incumbent upon the defendant to make out such circumstances to the satisfaction of the jury unless they arise out of the evidence produced against him.
The only person in a position to explain the circumstances surrounding the slaying of Poole was Nicolaou. It has always been the law in this state that the unexplained proof that the defendant killed another with a deadly weapon authorized a jury find malice and convict of murder. Flowers v. State, 473 So.2d 164 (Miss. 1985); Shields v. State, 244 Miss. 543, 144 So.2d 786 (1962) (reversed on other grounds); Stokes v. State, 240 Miss. 453, 128 So.2d 341 (1961); Hughes v. State, 207 Miss. 594, 42 So.2d 805 (1949); Smith v. State, 205 Miss. 283, 38 So.2d 725 (1949); Jones v. State, 178 Miss. 636, 174 So. 546 (1937); Talbert v. State, 172 Miss. 243, 159 So. 549 (1935); Wright v. State, 162 Miss. 494, 139 So. 869 (1932); Bennett v. State, 152 Miss. 728, 120 So. 837 (1929); Holmes v. State, 151 Miss. 702, 118 So. 431 (1928); Carter v. State, 147 Miss. 171, 113 So. 177 (1927); Johnson v. State, 140 Miss. 889, 105 So. 742 (1925).[1]
A killing with a deadly weapon may be susceptible of clear explanation by the accused or eyewitnesses as an accident, or justified as having been committed by the accused acting in lawful self-defense, or mitigated manslaughter. When no such proof is forthcoming the jury is warranted in finding the accused guilty of murder.
There is much more reason in this case for the jury to have found malice, because Poole's death could not have resulted from an accident. The violence inflicted upon him manifestly was intentional.
There is no proof in this record which would justify Nicolaou having committed the violence he did upon Poole, and no proof which would mitigate such violence from murder to manslaughter.
There was ample evidence for the jury to have found that Poole died from the brutal, savage and repeated violence inflicted upon him by Nicolaou with no lawful justification, excuse, or mitigating circumstances. The record fully supports his conviction of murder.
There is no merit in any of these assignments of error.

INSTRUCTION REFUSAL
Nicolaou next complains the circuit court erred in refusing Instruction D-4:
INSTRUCTION D-4
The Court instructs the Jury that malice aforethought is a necessary element of the crime of murder. However, even if actual malice existed at the time of the slaying, it is not always murder.
A person may be guilty of only manslaughter even when bearing ill will toward his adversary at the time of the killing, if the act is done while resisting an attempt of the latter to do any unlawful act, or after such attempt shall have failed if such anger or ill will is engendered by the particular circumstance of the unlawful act then being attempted or the commission of which is then thwarted, and is nonexistent prior thereto.
*173 Nicolaou argues that he was prejudiced by the court's refusal to grant this instruction because the court had granted the State's Instruction S-2:
INSTRUCTION S-2
The Court instructs the Jury that "malice aforethought" as charged in the Indictment in this cause and referred to in other instructions of the Court is a state of mind and does not have to exist in the mind of the slayer for any given length of time, and if the Defendant at the very moment of the fatal blow did so with the deliberate design to take the life of the deceased and not in necessary self-defense, real or apparent, then it was malice aforethought, and that was truly murder, as if the deliberate design had existed in the mind of the Defendant for minutes, hours, days or weeks, or even years.
The Court did not err in refusing to grant D-4; first because there was no evidence in the record warranting a manslaughter instruction, as we have noted; and second, because it did not correctly state the law.
This Court has criticized the granting of instructions such as S-2, see: Windham v. State, 520 So.2d 123 (Miss. 1987), and cases cited. There was no prejudicial error in the granting of this instruction in this case, however, because the evidence is clear that Poole was not killed instantaneously by some deadly weapon, but only after a brutal beating which took time and deliberation.
The circuit judge gave instructions on manslaughter which were not required under the evidence in this case. Instructions C. 17, p. 831; D-1, p. 835.

HABITUAL OFFENDER SENTENCE
Nicolaou's only contention meriting discussion under this assignment is that all crimes for which he was previously convicted arose from the same incident at the same time, and therefore Miss. Code Ann. § 99-19-81 did not apply.
The indictment, after charging Nicolaou with the offense of the capital murder of Poole, charges him as a habitual offender, reciting each conviction and sentence of the two murders, the conviction and sentence of armed robbery, and each conviction and sentence of kidnapping, all contrary to Miss. Code Ann. § 99-19-81.
In order to impose a sentence under this statute, the proof must show the defendant had been previously convicted twice for felonies "upon charges separately brought and arising out of separate incidents at different times."[2]
The State concedes in its brief that Nicolaou's contention is well taken as to the two murder convictions, and we need not address Nicolaou's contention as to these two crimes. Riddle v. State, 413 So.2d 737 (Miss. 1982). The State also points out, however, that the robbery and two kidnappings took place following the completion of, and apart and separate from the murders. The murders were of two men. Nicolaou then took one of the victim's car, and subsequently robbed a convenience store and kidnapped two females. All crimes took place on the same day, but the two murders and the kidnappings occurred at different times and different places, and clearly were two separate "incidents." No error was committed in sentencing Nicolaou under this statute to life without parole. Rushing v. State, 461 So.2d 710 (Miss. 1984); Crawley v. State, 423 So.2d 128 (Miss. 1982).

*174 SUPPLEMENTAL JURY INSTRUCTION AFTER JURY RETIRED
The jury retired to consider its verdict at 10:53 a.m. At 12:25 p.m. the court received some questions from the jury. One of the questions requested the court to further define "malice aforethought," and "beyond a reasonable doubt." Another question asked the court to define "without malice." The circuit judge from Black's Law Dictionary, and over defense objection, gave the jury a definition of "malice aforethought," and declined to further elaborate upon "reasonable doubt."
The record reveals the following instructions by the court:
COURT:
You asked for a definition of malice aforethought, a further definition of malice aforethought, without malice and reasonable doubt.
I think I have done the best I can with those and you will be allowed to take those with you. But, I will read it to you as the law provides.
In the definition of "Murder," malice aforethought exists where the person doing the act which causes death has an intention to cause death or grievous bodily harm to any person, (whether the person is actually killed or not) or to commit any felony whatever has the knowledge that the act will probably cause the death or grievous bodily harm to some person, although he does not desire it or even wishes that it may not be caused  it means evil design in general, the dictate of a wicked, depraved and malignant heart; not premeditated personal hatred or revenge toward the person killed but that kind of unlawful purpose which, if persevered in, must produce mischief.
Now, without malice, of course, means the absence of the above. That almost goes without saying, as to that.
Now, with reference to your question concerning reasonable doubt, I am not permitted, under Mississippi Law to define for you "reasonable doubt." Each of you must determine what is reasonable; it is a lay term and not a legal term.
All of you know what reasonable is, as well as I do, all of you.
The jury again retired to consider its verdict at 1:10 p.m., and reached a verdict at 3:01 p.m. that day.
Nicolaou complains of the circuit judge's granting this additional instruction to the jury.
On this contention we must agree that the court erred in granting this additional instruction. As the court observed, the jury was asking for a definition, not an application. (R. 714) Instructions, however, should be tailored to the facts of a case. Lancaster v. State, 472 So.2d 363 (Miss. 1985); Fairchild v. State, 459 So.2d 793 (Miss. 1984); Pittman v. State, 297 So.2d 888 (Miss. 1974); McBroom v. State, 217 Miss. 338, 64 So.2d 144 (1953). Moreover, in Smith v. State, 237 Miss. 626, 114 So.2d 676 (1959), we observed that it was unnecessary and unwise for the circuit court to attempt to define "malice" in jury instructions.
This definition first states that "malice aforethought exists where the person doing the act which causes the death has an intention to cause death or grievous bodily harm to any person." An essential element of the crime of murder is the felonious and premeditated intent to kill, not simply to do grievous bodily harm. Pitts v. State, 241 So.2d 668 (Miss. 1970).
The definition additionally defines "malice aforethought" as existing when the defendant has an intention "to commit any felony whatever, has the knowledge that the act will probably cause the death or grievous bodily harm to some person, although he does not desire it or even wishes that it may not be caused ..."
The definition as given could only have confused the jury. Since we cannot find that it was harmless, we must reverse. Harris v. State, 244 Miss. 552, 144 So.2d 790 (1962); Hawthorne v. State, 58 Miss. 778 (1881); Josephine v. State, 39 Miss. 613, 2 Mor.St.Cas. 1439 (1860).
*175 In Girton v. State, 446 So.2d 570 (Miss. 1984), we made some observations in regard to a circuit judge giving supplemental instructions to the jury after it retires to consider its verdict. We stated:
The second recommendation requires the trial judge to constantly bear in mind that justice in every trial requires communication and understanding. Unless words are clearly understood, there is only a communication of sound, or worse, a distinct possibility of the receiver of the information placing a different meaning on what is spoken or written than the author meant. This is critical in any communication from the circuit judge to the jury, or between the judge and jury.
446 So.2d at 573.
We found it critically important that the judge understand precisely what the jury meant by its inquiry. Just as important is that the jury understand precisely what the court meant by its instruction.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
GRIFFIN, J., not participating.
NOTES
[1] It must never be overlooked that this presumption is dissipated if proof of the circumstances surrounding the slaying are shown. See: Fairchild v. State, 459 So.2d 793 (1984); Hendrieth v. State, 230 So.2d 217 (1970); Johnson v. State, 223 Miss. 167, 77 So.2d 824 (1955); Dickins v. State, 208 Miss. 69, 43 So.2d 366, sugg. error o'ruled, 208 Miss. 69, 43 So.2d 887 (1950); Crockerham v. State, 202 Miss. 25, 30 So.2d 417 (1947); Durr v. State, 175 Miss. 797, 168 So. 65 (1936); Patty v. State, 126 Miss. 94, 88 So. 498 (1921).
[2] 99-19-81. Sentencing of habitual criminals to maximum terms of imprisonment.
Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.