542 So.2d 222 (1989)
Boots C. (Buddy) BLANKS
v.
STATE of Mississippi.
No. 58318.
Supreme Court of Mississippi.
March 15, 1989.
Samuel H. Wilkins, Jackson, for appellant.
Mike Moore, Atty. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:
If the desire to kill and the opportunity to kill came always together, who would escape hanging?
Mark Twain, Following the Equator.

I.
Today's appeal presents the plea of a disabled Vietnam veteran who has been found guilty of shooting two unarmed men with whom he had feuded following a chase of several miles. Defendant does not deny loading and firing his gun, claiming only that he acted to defend himself from his victims' attempt to run him down with a truck. A jury in a changed venue heard it all and returned guilty verdicts of murder and aggravated assault. We affirm.

II.[1]
Boots C. (Buddy) Blanks, 58 years old, has lived in Monticello, Mississippi, for eight years. He is married to the former Helen Dickey and has two sons, Robert, age 18, and Howard, age 16. Blanks is retired from the Army, having spent ten years on active duty and sixteen years in the Reserves. When he retired he had ascended to the rank of Major. While Blanks was on active duty, he served in combat in Korea and in Vietnam, where he served as a combat company commander with the Army Special Forces. During his last tour of duty he was severely wounded, necessitating the amputation of his right arm above the elbow. Altogether, Blanks had an exemplary military career and was awarded the Distinguished Service Cross, the Silver Star, the Bronze Star, the Combat Infantry Badge (twice), and, of course, *223 the Purple Heart. He has in recent years been employed as a public relations consultant by a company which manufactures artificial limbs.
Blank's wife Helen had inherited from her father a great deal of property located in Lawrence County, most of it within the Monticello city limits. The land is mainly cropland which the Blankses have leased to local farmers. There are also two houses on the land, located approximately 300 feet apart and connected by a circular driveway. In the summer of 1986 Buddy Blanks was separated from his wife, living with his son Robert at the smaller guest house. His wife and younger son were living in the main house.
Jimmy Selman, a farmer, thirty-eight years old, is a life-long resident of Monticello. Selman and his brother, through their agricultural partnership, had leased the Blankses' arable land for three years, ending after the 1985 harvest. Although Selman's lease was actually with Helen Blanks, who held title to the land, her husband had much to say regarding Selman's management of the cropland. Buddy Blanks often criticized Selman's farming methods; berated Selman's drivers for speeding on his property; and expressed disappointment at his family's share of the gross. The friction in the relationship resulted in a complete failure to agree on a rental contract for the 1986 season.
In the spring of 1986 Buddy Blanks had telephoned Selman a number of times, demanding that Selman return certain keys given to Selman to allow him access to the fields. Selman returned all of the copies of the keys that he could find to Helen Blanks, but he could not account for all of them. The tensions and animosities between Buddy Blanks and Jimmy Selman simmered in the sun as the summer of 1986 approached.
Saturday, June 14, 1986, began as a day of pastoral pursuits in Monticello. Buddy and Helen Blanks attended a Little League baseball game in which their son Howard was playing. Jimmy Selman worked in his fields harvesting wheat until mid-afternoon. He then went to a friend's house on the Pearl River where a fish-fry was being held. At the fish-fry Selman met his best friend, Danny Ford Ready, who he had known all of his life. Ready occasionally helped Selman in his farming operations on his days off from a local paper company. Selman and Ready left the fish-fry in Selman's one-ton flatbed Ford truck, taking a cooler of beer with them. They first went to a baseball game, staying only fifteen or twenty minutes.
After leaving the baseball game and while on their way to another friend's house, Ready and Selman decided to pay a visit to Buddy Blanks, though it was late at night. Apparently, Blanks had been criticizing the quality of Selman's farming operation rather publicly, and this had come to Selman's attention. Selman's purpose in going to Blanks' house was to "tell him if he had anything else to say about this bad deal he got, to tell me to my face and not be out here in public talking about it or whatever."
Selman knew that Blanks was separated from his wife and was staying at the guest house on the Blanks property. The two men arrived at approximately 10:30 p.m. Although Blanks' car was not in the driveway, Selman stopped because he thought he saw a light in the house. In fact, Blanks was at his wife's house in the backyard "cooking out".
As Selman backed his truck into the driveway, one corner of the flatbed struck and became entangled in a fence post. Selman tried to drive forward, but the wheels of the truck spun in the gravel driveway. He then caused the truck to lurch backwards and forwards a number of times in an effort to disengage the post from the rear of the truck. During this procedure, the bed of the truck struck a post supporting the porch of the house, knocking the post down. Unknown to Selman or Ready, Buddy Blanks, having been alerted to their presence by the sound of spinning tires in the gravel driveway, watched from the porch of his wife's house. After freeing the truck, and having seen no one, Selman assumed that Blanks was not home, so he and Ready drove off.
*224 Selman and Ready proceeded west on Bogue Chitto Avenue, a two-lane road, away from town. Blanks immediately gave chase in his new Chevrolet Caprice. He soon caught up with the slower-moving truck.
Selman and Ready were unaware of Blanks' pursuit until they saw Blanks' car pass the truck as it was traveling west on Bogue Chitto Avenue. They had only traveled a short distance and were still within the Monticello city limits. Selman immediately recognized the car as belonging to Blanks and, knowing that Blanks would be angry, had no desire to stop and talk with him. After the Caprice had passed the truck, it swerved in front of the truck and slowed, its brake lights flashing. Selman was unable to stop the large vehicle and it struck the rear bumper of the Caprice, damaging its right rear quarter-panel. The truck then edged into the left-hand lane and attempted to pass the Caprice, momentarily inching ahead of it. The Caprice, however, accelerated and the two vehicles proceeded west, side by side, on Bogue Chitto Avenue. Selman estimated their speed at forty to forty-five miles per hour.
The Caprice began to overtake the truck. Finally, the pursuing car outside his window. Ready shouted "there he is!" When Selman turned to respond to Ready, he heard gunfire and saw a number of muzzle flashes through the passenger window of the truck cab. Selman ducked and immediately applied the brakes, stopping the truck in the middle of the road. He looked up and observed Buddy Blanks' Caprice sideways across the road, blocking both traffic lanes. When he saw the door of the Caprice begin to open, Selman at once placed the truck in reverse, backed into a driveway, and sped away heading east on Bogue Chitto Avenue back toward town. As he drove off, he heard more gunfire.
At this time, Ready was slumped across the seat of the truck with his head in Selman's lap. Selman told him that it was safe to get up as they were out of range. Ready did not respond. Selman immediately drove to the local hospital. Danny Ford Ready died soon afterward. He is survived by his wife, son, and two step-daughters.
In all, the Selman truck had been hit by at least five bullets. Two bullet marks were found in the rear bumper area of the truck. Three bullets had entered the cab of the truck, all from the passenger side. One had entered through the open passenger's window, striking Danny Ford Ready behind the right ear. Two bullets entered the cab through the passenger side door, one striking Selman in the forearm, the other (presumably) exiting the cab through Selman's open window.
Buddy Blanks tells a different story of the events on Bogue Chitto Avenue. He says he acted in self-defense. Blanks admits that he overtook the truck as it headed west on Bogue Chitto Avenue, swerving in front of it and then applying his brakes in an attempt to stop the vehicle. Blanks claimed that the truck then sped up and rammed the rear of his Caprice two or three times before both vehicles came to a stop. He testified that after stopping his car, he reached under his seat and retrieved his 9-millimeter automatic pistol, which he kept in his car to shoot troublesome beavers. As he left his vehicle and walked toward the truck, with gun in hand, the driver of the truck attempted to run him over. Blanks stepped back and fired his pistol at the oncoming truck. He stated that he continued to shoot until the gun was out of ammunition. After the truck had driven off, Blanks returned home, had his son Howard reload his weapon, and instructed his wife to call the police.
Officer Donnie Mullins of the Monticello Police Department soon arrived and Blanks showed him the damage to his car. Mullins questioned Blanks about the gunfire but he was interrupted by a radio call requesting him to go to the hospital. He related to the jury the substance of this conversation with Blanks, and ended with
Q. Do you recall him [Blanks] saying anything about the shooting victim in the hospital and making any statement about the shooting victim in the hospital?
A. At his home, yes, sir. We were at his home. This was before  well, during *225 the time the radio call came in about the shotgun victim at the hospital. And I told him I had a shotgun victim at the hospital and had to go. He told me, "I hope that's the son of a bitch I shot."

B.
On October 24, 1986, Buddy Blanks was indicted by a Lawrence County Grand Jury for the murder of Danny Ford Ready, Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1988), and the aggravated assault of Jimmy Selman, Miss. Code Ann. § 97-3-7(2)(b) (Supp. 1988). These charges arose out of the shooting incident of June 14, 1986. On Blanks' motion venue was changed to Forrest County, Mississippi.
The case was called for trial on February 2, 1987. Three days later the jury returned a verdict that Blanks was guilty on each count. Blanks' post-trial motions for j.n.o.v. and for a new trial were subsequently denied. The Circuit Court has sentenced Blanks to serve a term of life imprisonment for the murder conviction and fifteen (15) years for the aggravated assault conviction, the sentences to run consecutively. Blanks now appeals to this Court.

III.
Blanks argues that he was tried impermissibly under a multi-count indictment, one that contained both a charge of murder and a charge of aggravated assault, and was thus impermissible. His argument is several years late.
Well before Blanks' trial our legislature enacted Miss. Code Ann. § 99-7-2 (Supp. 1988), to-wit:
Two or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if:
(a) the offenses are based on the same act or transaction; or
(b) the offenses are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
Miss. Code Ann. § 99-7-2(1) (Supp. 1988). This statute, although addressing a matter of practice and procedure in criminal prosecutions, has been accepted and enforced by this Court. Brown v. State, 534 So.2d 1019, 1021-23 (Miss. 1988); Estes v. State, 533 So.2d 437, 439 (Miss. 1988); Woodward v. State, 533 So.2d 418, 421-22, 436-37 (Miss. 1988). See also McClendon v. State, 539 So.2d 1375, 1377 n. 2 (Miss. 1989).
The offenses charged against Buddy Blanks were properly consolidated into a single, multi-count indictment. Both the murder and the aggravated assault arose from a single fusillade, certainly a single transaction, episode or event. Blanks' presented the same defense to the two charges  self-defense. Practically, all of the evidence admissible against Blanks on the murder count was also admissible against him on the assault count, and vice versa. No legally cognizable prejudice could be said to have resulted from the consolidation at trial of the two charges. See Davis v. State, 476 So.2d 608, 609 (Miss. 1985) (evidence relating to two shooting victims admissible in trial on one charge of aggravated assault where both crimes "interwoven and close in point of time").
The assignment of error is denied.

IV.
Blanks next argues that the Circuit Court erred when it refused to enter judgment of acquittal notwithstanding the verdict of the jury. His specific point is that the evidence is legally insufficient to establish that he acted with any premeditation or malice aforethought when he discharged his weapon into the truck. As to the aggravated assault conviction, Blanks claims that he was unaware of the identity of the people in the truck, from which he argues that he was unable to form the requisite intent necessary for a conviction on that charge. Additionally, he re-argues that his actions were all taken in self-defense.
Our scope of review of such points is as familiar as it is limited. All of the evidence must be considered in the light most favorable to the prosecution. May v. State, 460 So.2d 778, 781 (Miss. 1984); Winston v. State, 479 So.2d 1093, 1095 (Miss. 1985). *226 The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the credible evidence. Burge v. State, 472 So.2d 392, 396 (Miss. 1985).
If the facts and inferences so considered point in favor of the defendant with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the assignment of error should be sustained. On the other hand, if there is substantial evidence in the record of such quality and weight that having in mind the beyond-a-reasonable-doubt burden-of-proof standard, reasonable fair minded men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury's verdict.
Weeks v. State, 493 So.2d 1280, 1282 (Miss. 1986); Gray v. State, 487 So.2d 1304, 1310 (Miss. 1986); Winston v. State, 479 So.2d 1093, 1096 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984).
Blanks acknowledges that he is fighting an up-hill struggle on this assignment. He then mistakenly proceeds to argue the facts of the case in a light most favorable to the defense  facts which were necessarily rejected by the jury. The facts recounted above, with the disputes resolved consistent with the verdict, are legally adequate to undergird each conviction.
We are not unmindful of Blanks' argument that, because his right arm has been amputated above the elbow, the prosecution's theory of the facts is infected with physical impossibility. We do not so regard the evidence. Still, the point has such force that we should reiterate a reflection from a case decided several years ago.
Of course, this assignment of error turns not upon how we see the evidence, for our institutionally mandated and self-imposed scope of review is quite limited. That limitation is premised upon our candid recognition that the jury system is at best the least imperfect way we have of determining guilt or innocence. We cannot help but be aware that a rational, fair-minded juror could well have found [the defendant] not guilty. Nevertheless, were we to substitute our view for the jury's, one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings have been made by twelve citizens, peers of the defendant, who are on the trial scene and have smelled the smoke of the battle.
Harveston v. State, 493 So.2d 365, 372 (Miss. 1986).
Blanks' contention that his ignorance of the identity of his assault victim somehow vitiates his conviction is specious. He knew he was shooting at a fellow human being, even on his version of the facts. One does not have to possess ill-will toward or even know the identity of a specific individual to commit an aggravated assault on that person. Davis v. State, 476 So.2d 608, 610 (Miss. 1985).
The assignment of error is denied.

V.
Blanks challenges two instructions given to the jury relating to the murder count of the indictment. He contends that the so-called special "deliberate design" instruction[2] was in hopeless conflict with the "heat of passion" manslaughter instruction.[3] Both of these instructions were submitted by the prosecution.
Premeditation is an element of murder. Miss. Code Ann. § 97-3-19(1) (Supp. 1988). This connotes a prior design to kill. Although *227 our law has never prescribed any particular ex ante time requirement, the essence of the required intent is that the accused must have had some appreciable time for reflection and consideration before pulling the trigger. In this context, we have for years condemned instructions that tell the jury in homicide cases that "malice aforethought" or "deliberate design"[4] may be found though it has existed in the mind of the accused but for an "instant" or a "moment". The most recent of these cases is Windham v. State, 520 So.2d 123 (Miss. 1988) where we said
It is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act.
Windham, 520 So.2d at 126. See also Watts v. State, 305 So.2d 348, 350 (Miss. 1974) ("but for an instant at the very time the shot is fired"); Toney v. State, 298 So.2d 716, 719-20 (Miss. 1974) (same); Pittman v. State, 297 So.2d 888, 893 (Miss. 1974) (same); Patterson v. State, 289 So.2d 685, 686 (Miss. 1974) ("at the very moment the fatal shot was fired"); McDonald v. State, 78 Miss. 369, 375, 29 So. 171, 172 (1901) ("existed but an instant"). Cf. Nicolaou v. State, 534 So.2d 168, 173 (Miss. 1988). Where such instructions are given in a case where under the evidence the jury might reasonably have concluded that the defendant acted in the heat of passion, we will on the authority of these cases ordinarily reverse.
In the case at bar, the defense at trial was justifiable homicide, Miss. Code Ann. § 97-3-15(f) (Supp. 1988), colloquially known as self defense. Here, as recited above, Blanks saw Selman and Ready damage the post on his house and then pursued them for several miles, pulled abreast of them and opened fire. On Blanks' view, he pulled in front of Selman and Ready, stopped his car, loaded his gun, and fired. To be sure, Blanks claims that he was in a state of rage from the time he began his pursuit of his victims. Under any interpretation, enough time elapsed  close to fifteen minutes  that the law charged Blanks to cool his temper and act responsibly.
The point is that there is no reasonable factual scenario under which the jury may reasonably have concluded, paraphrasing the words of Instruction S-4, that Blanks' premeditated design to kill, if any, existed in his mind but for an instant before the fatal act. On the prosecution's interpretation of the evidence, the premeditated or deliberate design existed well before the shooting. On the defense theory, it never existed. In this context, we declare the granting of Instruction S-4 as harmless error. Nicolaou v. State, 534 So.2d 168, 173 (Miss. 1988).
We are reenforced in our view of the harmlessness of this error because of the other instructions in the case. Instruction S-3 provided a general definition of murder which we find without fault. Instruction S-6 defines "heat of passion" manslaughter. Instruction S-7 provides another definition of murder including both the term "malice aforethought" and "deliberate design". Instruction S-10 distinguishes murder from manslaughter. Instruction D-4A provides a general definition of "deliberate design" murder. Instruction D-5A explains the difference and distinction between murder and manslaughter. Instructions S-5 and D-13A submitted to the jury the self defense issue. These other correct instructions sensibly suggest that the jury's concentration on the impermissible phrase in Instruction S-4 was quite unlikely.
*228 We reiterate our condemnation of "but for an instant" murder instructions. In many ways this is a classic case of a prosecuting attorney requesting too many instructions defining a single concept. By reason of the evidence in the record before us and the full and correct instructions otherwise given the jury on the three central issues in the case, we hold the error in Instruction S-4 harmless beyond a reasonable doubt.
The assignment of error is denied.

VI.
Blanks finally urges that he be given a new trial, that the Circuit Court abused its discretion when it denied his post-trial motion for a new trial. The point goes to the weight of the evidence, not its legal sufficiency. See Rule 5.16, Miss.Unif.Crim.R. Cir.Ct.Prac. (1979). That we regard the motion for a new trial as one addressed largely to the Circuit Court's discretion does not insulate denial from reversal. That nature of the motion does demand deference and that we stay our hand absent a clear abuse of discretion below. See Crenshaw v. State, 520 So.2d 131, 135 (Miss. 1988); Johnson v. State, 511 So.2d 1360, 1367 (Miss. 1987). Employing our familiar standards of review, we decline to intervene.
The assignment of error is denied.
Blanks' other points are sufficiently devoid of merit that neither discussion nor reversal is required.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED; CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN (15) YEARS IMPRISONMENT AFFIRMED
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON and BLASS, JJ., concur.
PITTMAN, J., not participating.
NOTES
[1] By reason of the jury's verdict we are obliged to state the facts with a slant toward the victim's view.
[2] Instruction S-4 tendered by the prosecution read as follows:

The Court instructs the Jury that while malice aforethought is a necessary ingredient to the crime of murder, that malice aforethought does not necessarily mean hatred or ill will and need not exist in the mind of the defendant for any definite time, nor for hours, days or even minutes, but if there is malice aforethought and a premeditated design to kill and it exists in the mind of the defendant but for an instant before the fatal act, there is sufficient premeditation and malice aforethought to constitute the offense of murder, unless the killing is justifiable.
[3] The "heat of passion" manslaughter instruction granted to the prosecution over the defendant's objection read as follows:

The Court instructs the Jury that the killing of a human being, without malice, in the heat of passion, by the use of a dangerous weapon, without authority of law and not in necessary self-defense, either real or apparent, is manslaughter. Therefore, if you believe by the evidence in this case beyond a reasonable doubt that on or about the 14th day of June, A.D., 1986, that the defendant acted in the heat of passion, without malice, without authority of law and not in necessary self-defense, either real or apparent and as a result thereof and by the use of a dangerous weapon did kill Danny Ford Ready, a human being, then you should not find the defendant guilty of murder in Count 1 and if you find beyond a reasonable doubt that the defendant is guilty of manslaughter as herein defined then your verdict may be in the following form: "We, the jury, find the defendant guilty of manslaughter."
[4] Definitionally, we regard "malice aforethought" and "deliberate design" as synonymous. Fairman v. State, 513 So.2d 910, 913 (Miss. 1987); Johnson v. State, 475 So.2d 1136, 1139 (Miss. 1985); Lancaster v. State, 472 So.2d 363, 367 (Miss. 1985).