765 So.2d 573 (2000)
William WOODARD, Jr. a/k/a Junior Woodard, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01768-COA.
Court of Appeals of Mississippi.
March 14, 2000.
Rehearing Denied May 30, 2000.
Certiorari Denied August 24, 2000.
*574 Raymond M. Baum, Winona, Attorney for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorneys for Appellee.
BEFORE KING, P.J., DIAZ, AND IRVING, JJ.
DIAZ, J., for the Court:
¶ 1. William Woodard, Jr., appeals the decision of the Attala County Circuit Court convicting him of aggravated assault and possession of a firearm by a convicted felon. Woodard raises the following issues in this appeal: whether the evidence presented at trial was sufficient to establish the crimes of aggravated assault and possession of a firearm by a convicted felon and whether the jury's verdict was against the overwhelming weight of the evidence. Finding no error, we affirm the ruling of the circuit court.

FACTS
¶ 2. Richard Ford, who owns and operates Ford's Handi Mart on Highway 35 South in Attala County, testified that during store hours three men came in and ordered drinks and chips. He observed each and noticed that one of the youths was on crutches. They left the store but returned at 9:45 p.m. that night. At 10:00 p.m., one of the males, identified later as Woodard, pointed a handgun at Ford, told him to turn around, and then shot him in the jaw, where the bullet went down his throat and damaged an artery, his windpipe and vocal cords.
¶ 3. While bleeding on the floor, Ford wrote a note that read, "Three black males, one on crutches." Ford testified that, when Woodard shot him, he did not see any crutches but stated that his note referred to when he saw Woodard on crutches earlier that day in his store. At the preliminary hearing, Ford identified Woodard as the shooter stating, "No doubt in my mind. I will never forget that face." He also identified still frame photographs of Woodard from a nearby convenience store taken on the same night as the shooting. Ford gave a prior statement to Deputy Kenny Summers, an investigator for the Attala County Sheriffs Department, that indicated that Woodard was on crutches when he entered the store at 9:45 p.m. as well as at 8:30 p.m. Although Ford gave a short statement to Summers before Nacuron, a paralysis agent, and a general anesthesia were administered, he could not explain why he was not clear about when Woodard was seen on crutches. Trial testimony indicated that he was on heavy drugs after surgery.
¶ 4. Coolidge Perteet, a friend of Woodard's and an eyewitness called by the State, testified that it was Woodard who shot Ford. Perteet testified that Jerrod Erving, Woodard, and he had been in the store earlier that day. Perteet also stated that Woodard had a gun which he obtained from a "crack head." He said Woodard was not on crutches when he entered the store at 9:45 p.m. He said that once inside the convenience store, he heard Woodard tell Ford to turn around and get down. When questioned Perteet testified that he saw the gun fire. He stated that it was Woodard who had a gun and that he saw Woodard shoot Ford. Perteet also stated that he was not coerced to testify that Woodard shot Ford.
¶ 5. Jerrod Erving, who is Perteet's cousin, initially testified that he heard a shot but that he did not know who did it, but that he was sure it was not Woodard. He also stated that the district attorney threatened to charge him in the matter if he did not testify that Woodard shot Ford.
¶ 6. Harold Boyd testified that Woodard obtained the gun from a man named Le-Roy. He described how Woodard, Perteet, *575 Erving, and he went to Ford's several times, but that he did not go into the store when Woodard shot Ford. Boyd also stated Woodard did not use his crutches when he went into Ford's the final time.
¶ 7. Deputy Summers testified that he arrived at Ford's Handi-Mart contemporaneously with Ford being taken to the hospital. He remained at the crime scene where he discovered the bloody note written by Ford and a .25 caliber spent cartridge. He also photographed the store including the bloody floor. Afterwards, Summers took a photo of Woodard, who was a suspect in the shooting, to the hospital where Ford was awaiting air transport to University Medical Center in Jackson. According to Summers, Ford identified the photo of Woodard as the shooter and that he was on crutches. During cross-examination, Summers conceded that Ford described the shooter as wearing a baseball-type shirt. It was later revealed that Erving, not Woodard, was wearing the baseball shirt.
¶ 8. During a taped conversation between Ford and Summers, Ford said of the two men who entered the store at 9:45 p.m. and stood by the chip rack, one was on crutches. Summers also testified that he attended the preliminary hearing and saw Ford identify Woodard as the shooter.
¶ 9. At the close of the State's case-in-chief, Woodard made a motion for a directed verdict which was denied.
¶ 10. Woodard called Bryan Paige and Herbert Lee Townsend, who were both longtime friends, to testify that he was never without his crutches. Although both testified accordingly, neither was with Woodard the night of the shooting.
¶ 11. Woodard recalled Boyd to the stand. Boyd testified that he saw Perteet with the gun after the shooting and that he was wiping it down. Boyd stated during this testimony that, although Woodard was looking for a gun, he never got one. He also stated that only once during the evening was he far enough away from Perteet and Woodard for Perteet to have given Woodard the gun. Emma Jean Woodard, Woodard's sister, also testified that Perteet wiped his prints off the gun before he hid it.
¶ 12. Perteet was also recalled to the witness stand by Woodard. He stated that the district attorney made him testify that Woodard shot Ford. However, Perteet stated that Woodard was the shooter because he saw Woodard's light-colored hand holding the gun. Perteet explained that Woodard was lighter in skin color than Erving and himself.
¶ 13. Woodard was convicted for aggravated assault and possession of a firearm by a convicted felon and sentenced for twenty years and three years, respectively, in the custody of the Mississippi Department of Corrections. His motion for a JNOV or, in the alternative, a new trial was denied. Feeling aggrieved, Woodard perfects this appeal.

DISCUSSION

I. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO ESTABLISH THE CRIMES OF AGGRAVATED ASSAULT AND POSSESSION OF A FIREARM BY A CONVICTED FELON AND WHETHER THE JURY'S VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE

A. Sufficiency of the Evidence
¶ 14. A challenge to the sufficiency of the evidence requires an analysis of the evidence by the trial judge to determine whether a hypothetical juror could find, beyond a reasonable doubt, that the defendant is guilty. May v. State, 460 So.2d 778, 781 (Miss.1984). If the judge determines that no reasonable juror could find the defendant guilty, then he must grant the motion for a directed verdict and JNOV. Id. If he concludes that a reasonable juror could find the defendant guilty *576 beyond a reasonable doubt, then he must deny the motion. Id. This Court's scope of review is limited to the same examination as that of the trial court in reviewing the motions for directed verdict and JNOV; that is, if the facts point in favor of the defendant to the extent that reasonable jurors could not have found the defendant guilty beyond a reasonable doubt, viewing all facts in the light most favorable to the State, then it must sustain the assignment of-error. Blanks v. State, 542 So.2d 222, 225-26 (Miss.1989). Of course, the opposite is also true. We may reverse the trial court's ruling only where one or more of the elements of the offense charged is lacking to such a degree that reasonable jurors could only have found the defendant not guilty. McClain v. State, 625 So.2d 774, 778 (Miss.1993).
¶ 15. Here, legally sufficient evidence existed to find Woodard guilty beyond a reasonable doubt. The State made out its prima facie case by putting into evidence Ford's and Perteet's eyewitness testimonies which identified Woodard as the shooter. Additionally, Ford wrote a short note after he was shot that described the suspects, including the fact that one of the suspects was on crutches. Ford testified that he had seen Woodard in the store earlier that day on crutches, but that Woodard was not on crutches when he shot Ford. Deputy Summers testified that Ford made a photo identification of Woodard shortly after the shooting. Boyd's testimony also bolstered the State's theory that Woodard was the shooter. Since the State put forth sufficient, credible evidence, the trial judge was required to leave the final decision of guilt or innocence to the jury. We affirm the trial judge's ruling with regard to the motion for a directed verdict.

B. Weight of the Evidence
¶ 16. The next motion we will review is that for a new trial. This goes to the weight of the evidence and not its sufficiency. In reviewing this claim, this Court must examine the trial judge's denial of Woodard's motion for a new trial. Jones v. State, 635 So.2d 884, 887 (Miss. 1994). The decision of whether or not to grant a motion for a new trial rests in the sound discretion of the trial judge and should only be granted when the judge is certain that the verdict is so contrary to the overwhelming weight of the evidence that failure to grant the motion would result in an unconscionable injustice. May, 460 So.2d at 781. In making the determination of whether a verdict is against the overwhelming weight of the evidence, this Court must view all evidence in the light most consistent with the jury verdict, and we should not overturn the verdict unless we find that the lower court abused its discretion when it denied the motion. Veal v. State, 585 So.2d 693, 695 (Miss.1991). The proper function of the jury is to decide the outcome in this type of case, and the court should not substitute its own view of the evidence for that of the jury's. Id. Likewise, the reviewing court may not reverse unless it finds there was an abuse of discretion by the lower court in denying the defendant's motion for a new trial. Id. Upon reviewing all of the evidence as noted by the facts of this case, even those that conflict, and when presented in the light most consistent with the verdict, we find that the trial judge did not abuse his discretion in denying Woodard's motion for a new trial. Accordingly, we dismiss this assignment of error as lacking in merit.
¶ 17. THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT OF CONVICTION ON COUNT I OF AGGRAVATED ASSAULT AND A SENTENCE OF TWENTY YEARS; AND COUNT II OF POSSESSION OF FIREARM BY A CONVICTED FELON AND SENTENCE OF THREE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO ATTALA COUNTY.
*577 McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
IRVING, J., dissenting:
¶ 18. I am unable to join the majority's affirmance of Woodard's conviction, not because the evidence is insufficient to support a finding that he was a participant in the crime charged, but because the overwhelming weight of the evidence is against a finding that he was the trigger man, and since he was not charged as an accomplice or under a scheme which would allow for his conviction as a participant, I must, with genuine respect for the view expressed by the majority, dissent. In the discussion that follows, I will try to point out why Woodard's conviction should be reversed notwithstanding the fact that the jury heard the evidence and convicted him on it.
¶ 19. It is well settled in Mississippi jurisprudence that the jury, and not the appellate court or even the trial court, is vested with the sole authority to weigh the evidence in a trial and decide the credibility of the witnesses that come before it. Kelly v. State, 553 So.2d 517 (Miss.1989). This is a time honored and tested undergirding in our jurisprudence and one that appellate judges are bound to respect. However, if appellate review means review in substance and not in form, an appellate court should not abdicate its role which is distinctly more than deferring to the verdict of the jury when there are compelling reasons not to do so in a given case. In my humble estimation, this is such a case.
¶ 20. As stated, there is no doubt that the evidence is sufficient to support a finding that Woodard, along with others, conspired to rob Ford's Handi Mart and that Woodard was present when Ford was shot. However, Woodard was not charged with conspiring to rob Ford's Handi Mart or aiding and abetting in the aggravated assault on Richard Ford. He was charged with shooting Ford, and therein lies the rub.
¶ 21. On the night Ford was shot, three individuals, Coolidge Perteet, Jerrod Erving and Woodard, came into Ford's Handi Mart. They came the first time around 8:30 p.m. and returned a little before 10:00 p.m. It was during this last visit that the shooting occurred.
¶ 22. The State sought to prove its case against Woodard by the testimony of Perteet, Erving and the victim, Ford. Perteet was called by the State, and as indicated by the majority opinion, did testify on direct that Woodard shot Ford. However, after Perteet testified for the State during the first day of the trial, the following colloquy transpired on the second day before he was called back to the stand by the defense:
BY THE COURT: Mr. Perteet, I want to advise you, once again, if you do testify against your ownabout your own involvement in the commission of a crime, then that testimony can be used against you in further prosecutions.
Also, if you come into this courtroom and you commit perjury, then that can subject you to future criminal prosecution.
BY THE WITNESS: Well, sir, I believe I committed perjury yesterday. Yesterday, hehe told me that I know who did it. And I kept telling him I didn't know who did it.
BY THE COURT: Well, you
BY THE WITNESS: See, hehe told me if Ihe told me I know damn well who did it. And he said, "You know Junior did it." And I said, "Well, Junior did it."
That's the only reason I got up in court yesterday and said Junior did it, because he kept telling mehe said I could be charged with armed robbery and aggravated assault.
BY THE COURT: Well, what I'm saying to you is if you testify today contrary *578 to what you did yesterday, then I suspect you will be indicted for perjury.
BY THE WITNESS: You're talking about if I say that Junior did do it?
BY THE COURT: I'm telling you right now that you've got a sworn obligation to tell the truth and nothing but the truth. And you took your oath yesterday, and you stated that you were doing that.
And if you're not telling the truth, if you lied yesterday, then that's going to subject you to being indicted for perjury. If you come in here and you lie today, that's going to subject you to being subject to being prosecuted for perjury.
So I'm telling you that you are under an obligation to tell the truth. You were yesterday. You understood that yesterday. You understand it today.
I don't care what you testify to. All I'm telling you is that you have sworn to tell the truth. If you start telling stories, I don'tI don't know what your testimony is. I don't know what it's going to be today.
But if you have not told the truth in the past, then that's going to subject you to being charged with perjury. If you lie today, that's going to subject you to being charged with perjury.
BY THE WITNESS: Yes, sir.
BY THE COURT: And if you get up here and you testify about your own participation in a crime, then that's going to subject you to being indicted for that. And you're fully aware of that?
BY THE WITNESS: Yes, sir.
BY THE COURT: Okay. You can bring the jury in.
¶ 23. After the above admonition from the court, Perteet, took the stand, and this is the evidence that was adduced:
Q. Mr. Perteet, I need to ask you a few questions. Some of them concern your testimony of yesterday. Mr. Perteet, you were not truthful yesterday with the court, were you?
A. Well, I wasI was truthfulno, sir, I wasn't. Because I reallyI don't know who did it. He kept telling me (indicating)he told me that Junior did it. He kept saying that Junior did it. He saidhe told me damn well I know that Junior did it. That's why I said that Junior did it.
Q. When you say he, who are you referring to?
A. The district attorney.
Q. Okay. Now, do you know what happened to the gun in this case?
A. Yes, sir.
Q. What happened to it?
A. When weafter he got tookafter Junior got took to jail, Jerrod had walked down the road and hid it.
Q. Okay. Junior did not hide the gun?
A. No, sir.
Q. Junior did not have a gun, did he?
A. He had it earlier, but he didn't hide it.
Q. Okay. Now, Mr. Perteet, the fact is Junior did not shoot Mr. Ford, did he?
A. Well, Iwell, Junior was behind me when the man got shot.
Q. Can you say whether or not Junior shot Mr. Ford?
BY THE WITNESS: Can I plead the Fifth on that?
BY THE COURT: No, not on that. Unless youunless you're saying that you're the one that shot him.
BY MR. BAUM:
Q. Do you want to take the Fifth Amendment?
A. No, sir
Q. Okay. Can you say whether or not Junior shot him?
A. Wellwell, yes, I can, because, see, Junior was behind me.
Q. Well, now, yesterday you said you were pretty sure?
A. I am pretty sure, because Junior was behind me.

*579 Q. And so
A. And Junior had the gun earlier before we had went in the store.
¶ 24. It is clear from the above colloquy that Perteet's testimony is totally unreliable. The court's statement to Perteet that Perteet could not take the Fifth Amendment unless Perteet was admitting that he shot Ford undercut the entire purpose of the Fifth Amendment. But more important for our purposes here, it compelled a response from Perteet which was virtually assured, because of the court's response, to be prejudicial, even after Perteet had admitted perjuring himself.
¶ 25. Jerrod Erving, who was with Perteet and Woodard when Ford was shot, emphatically testified that Woodard did not shoot Ford. During cross-examination, this following exchange took place:
Q. Okay. Now, I heard you say something abouthad you been threatened?
A. No, sir. Mr. Perteet told him that Monday.
Q. Okay. But, I mean, did anybody threaten charges on you if you didn't testify?
A. He did (indicating).
Q. Who was that now?
A. Mr.I don't know his name. I didn't get his name. But he told me that Monday. If we didn't say that Mr. Woodard did it, that he would bring the changes back up on us. Yes, sir, he did.
BY MR. HILL: I object, Your Honor. That's not true.
BY THE COURT: Well
BY MR. HILL: I want a chance to deny that
BY THE WITNESS: Yes, sir
BY MR. HILL:on the record.
BY THE COURT: Wait. Wait.
BY THE WITNESS: Yes, sir, he did. His mother was in there when you told us that. His mother was in there when you told us that. That if we didn't say Mr. Woodard did it
BY MR. HILL: Your Honor, I object.
BY THE COURT: Well
BY MR. HILL: This is improper.
BY THE WITNESS:you would bring the charges
BY THE COURT: I want you to be quiet and let Mr. Hill state his objection.
BY MR. HILL: Your Honor, my objection is this witness is not answering any question. He's making a narrative in support of his friend, the defendant, over here. This is not an answer to the question.
¶ 26. At trial, Ford, the victim, identified Woodard as the shooter. However, this identification was against the backdrop of Ford having failed to identify Woodard from a photo brought to the hospital by Officer Summers shortly after the shooting and after Ford having identified Erving, not Woodard, as the shooter from still photos from a surveillance camera. Also, Ford told Officer Summers that the person on crutches was at the chip rack when the shooter, in front of the counter, called to Ford to turn around. It is not disputed that Woodard was on crutches. Ford tried to reconcile the discrepance of having identified Woodard at trial as the shooter with having placed Woodard at the chip rack when the shooting occurred by explaining that he thought Officer Summers was asking him about when the men came in the store the first time. However, the transcript of that interview belies that assertion. Here is the transcript of that interview:
Deputy Summers: Today's date is May the 7th, of 1998. Today I'm going to be talking to Mr. Richard Ford about a shooting that occurred down here at his store, Ford's Handi Mart, back about the 13th day of April. Mr. Ford, could you start out by giving me your name, your address, and just *580 start off telling me what you remembered about that night of the shooting.
Mr. Ford: Richard Ford, Route 7, Box 195, zip 39105. Approximately around 8:30, three black males came in and, uh, they were getting some stuff and one of the guys said they wanted to get something else and the other one told him said, no sir, we'll get it on the way back, said, let's go. I think they said to McCool and said they would get that on the way back. So they got some chips and stuff and before they left they wanted to know what time I close. I told them around 10:00, and they said they would try to make it back before I closed. About fourteen minutes to ten they showed back up, and two of them went to the chip rack and really I don't know where that other one come from.
Deputy Summers: Okay.
Mr. Ford: But I was talking to the two at the chip rack and uh the next thing I knew one of them was in front of the counter and said, "Home boy, turn around," and I turned around, and he had his gun on me and I said, "Do what," and he said, "Home boy, I said turn around," and I just stood there, I didn't know what to do and I knew I couldn't get to my gun because it was under the counter, and uh the next first thing I knew they shot me and left.
Deputy Summers: Okay. The two that come in the store, first of all let me back up. Did you see what they were driving?
Mr. Ford: No sir.
Deputy Summers: The two that come in and went to the chip rack, do you remember anything that was special about them?
Mr. Ford: One of them was on crunches, and the other one wore glasses and had a band-aid across his nose.
Deputy Summers: Okay. How about the one that was in front of the counter, can you remember anything about him that would stand out?
Mr. Ford: Uh not, not really.
Deputy Summers: Okay.
Mr. Ford: Uh, it happened so very quick.
Deputy Summers: Do you believe that you would recognize them again if you saw a photo of them?
Mr. Ford: Uh, yes sir.
Deputy Summers: Is there anything else, anything else about that night that I hadn't asked you that you would like to tell me that youthat you remember since the last time I talked to you?
Mr. Ford: No sir.
Deputy Summers: Okay. This concludes the tape statement, date remains the same as May 7, 1998.
¶ 27. The identity of the shooter is the central issue in this case. It is clear to me that either Woodard, Perteet, or Erving was the perpetrator of this horrible crime. But it is equally clear to me that the verdict is against the overwhelming weight of the evidence, as that evidence points more overwhelmingly away from Woodard. For this reason, I would hold that the trial judge abused his discretion in not granting Woodard a new trial.