# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-02103-COA

**DARRELL ROSS BROOKS A/K/A DARRELL BROOKS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**


DATE OF JUDGMENT:            08/11/2011
TRIAL JUDGE:                 HON. JOHN C. GARGIULO
COURT FROM WHICH APPEALED:   HARRISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      WILLIAM ALEX BRADY II
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           JOEL SMITH
NATURE OF THE CASE:          CRIMINAL - FELONY
TRIAL COURT DISPOSITION:     CONVICTED OF MURDER AND
                             SENTENCED AS A HABITUAL OFFENDER
                             TO LIFE WITHOUT PAROLE IN THE
                             CUSTODY OF THE MISSISSIPPI
                             DEPARTMENT OF CORRECTIONS
DISPOSITION:                 AFFIRMED - 03/31/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., BARNES AND MAXWELL, JJ.**

**LEE, C.J., FOR THE COURT:**

¶1.     Darrell Ross Brooks was convicted of murder and sentenced as a habitual offender

to life without parole in the custody of the Mississippi Department of Corrections.  Brooks

filed post-trial motions, which the trial court denied.  Brooks now appeals, asserting that the

trial court erred by: (1) failing to grant his motion for a judgment notwithstanding the verdict

(JNOV); (2) denying his motion for a directed verdict and request for a peremptory jury

instruction; and (3) denying his motion for a new trial.

FACTS

¶2.     On December 7, 2009, shortly after 10:00 p.m., David Shivers was shot in the back of the head and died. Shivers's body was found on the floor of the kitchen in his mother's house in Gulfport, Mississippi, by his mother, Patricia Shivers; his brother, Jimmy Shivers; and Jimmy's live-in girlfriend, Kari Parker. All three were in the house when they heard a gunshot, but none of them witnessed the shooting. The kitchen window above the sink was broken, and glass shards were found in the wound in Shivers's head, leading investigators to the determination that the perpetrator shot Shivers through the kitchen window. The forensic pathologist estimated Shivers was shot with a shotgun from approximately six feet away.

¶3.     Dustin Cottrell, a neighbor who was outside smoking at the time of Shivers's murder, testified that he heard a gunshot around 10:00 p.m., then saw someone run from the alleyway behind Patricia's house. This person, who Cottrell said "appeared to be black," was wearing dark clothes and had a hood pulled over his face. Cottrell lived across the street and two houses down from Patricia. Cottrell lost sight of the man but heard the rattle of a chain-link fence, which made him think the man was jumping over the fences as he escaped.

¶4.     Investigators with the Gulfport Police Department learned that Shivers had been dating Amy Brooks, Brooks's estranged wife. Gabrielle Ledet, a friend of both Amy and Brooks, testified Brooks had become depressed after his separation from Amy. Ledet stated Brooks had begun following Amy and showing up at her work. After fighting with Amy at

2

her work, Brooks was told to stay off the premises. Ledet testified Brooks told her he would kill any man who was dating Amy. Ledet and Brooks texted back and forth most of the day of Shivers's murder. Ledet stated Brooks texted her around 9:00 p.m. on the night of the murder, saying he had a gun and was going to kill himself.

¶5.     Brooks had been working at McDonalds. His manager, Heather Lee, testified Brooks was angry about the state of his marriage. Lee said Brooks had been following Amy and knew about her relationship with Shivers.

¶6.     Charles Oatis, Shivers's coworker at McDonalds, testified Brooks spoke with him about his problems with Amy. Oatis stated Brooks knew Amy was seeing Shivers, and Brooks showed Oatis a picture of Shivers and told him, "I'm going to kill that man." This occurred a few days prior to Shivers's murder. Oatis said that on the day of Shivers's murder, Brooks asked him more than once if Oatis could help him buy a gun for fifty dollars. Brooks told Oatis that he only needed to use the gun one time. Oatis did not help Brooks find a gun.

¶7.     Michael Thompson testified that he first met Brooks at Jennifer Diaz's house a few days prior to December 7, 2009. Thompson stated he received a call from Brooks during the afternoon of December 7. Brooks told him that he "had some business to take care of" and asked to rent Thompson's gun for fifty dollars. Thompson declined. Thompson said Brooks called again between 6:00 and 7:00 p.m. that night asking if Thompson knew where he could find a gun. Brooks told Thompson "he had some problems to take care of and he needed to get them handled." Thompson testified that Brooks mentioned the problem concerned Amy

3

and another guy.

¶8.     Diaz testified she had only been friends with Brooks for approximately one week prior to Shivers's murder.  Diaz stated Brooks told her about his separation from Amy, how difficult the situation was, and how upset he was that Amy was dating Shivers.  On the day of Shivers's murder, Diaz received a call from Brooks asking for Thompson's phone number.  Diaz testified that later she went to a local bar and got back home around 9:30 or 10:00 p.m.  She stated that she and her boyfriend, Michael Odom, were watching the end of the NFL football game on television when Brooks knocked on the door.  Diaz thought this happened around 10:00 or 10:30 p.m. but was clear that the football game was ending when Brooks arrived.  Brooks asked Diaz to tell anyone who asked that he had been at her house since 8:00 p.m. that night.  Diaz said Brooks only stayed a few minutes before leaving.

¶9.     Odom testified that Brooks came over closer to 10:30 or 11:00 p.m.  Odom remembered that they were watching the Monday night football game, and the game clock showed three minutes left in the game.  Odom stated Brooks was wearing blue jeans and a top with a hood.  Odom testified that when he saw Brooks the next day, Brooks asked Odom to tell anyone who asked that Brooks was with Odom at Diaz's house the night before, and they were watching the football game.

¶10.    Detective Hugh Frazier with the Gulfport Police Department testified that the football game that night ended at 11:01 p.m.  Detective Frazier noted that Brooks was seen in the surveillance video of a nearby convenience store buying beer at 11:30 p.m. that night.

¶11.    Brooks's theory of defense was that several recent burglaries in the neighborhood

could have been related to Shivers's murder.

DISCUSSION

I.    JNOV

II.    DIRECTED VERDICT AND PEREMPTORY INSTRUCTION

¶12.    As Brooks's first two issues are related, we will address them together. Our standards of review for the denial of a motion for a JNOV, directed verdict, and peremptory instruction are the same. *Jefferson v. State*, 818 So. 2d 1099, 1110-11 (¶30) (Miss. 2002). All three challenge the legal sufficiency of the evidence presented at trial. *Id*. In reviewing the sufficiency of the evidence, "the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed[.]" *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (citation and internal quotation marks omitted). If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the essential elements of the crime existed, this Court will affirm the conviction. *Id*. Furthermore, it is well-settled law that the jury determines the credibility of the witnesses and resolves conflicts in the evidence. *Davis v. State*, 866 So. 2d 1107, 1112 (¶17) (Miss. Ct. App. 2003).

¶13.    The evidence against Brooks was circumstantial. No physical evidence linked him to the crime, and no eyewitness saw him shoot Shivers. Brooks argues because the case was circumstantial, the State was required to prove his guilt not only beyond a reasonable doubt, but also to the exclusion of every reasonable hypothesis consistent with innocence. He

requested a peremptory instruction based on this argument, but it was denied.

¶14.   Circumstantial evidence is evidence that, "without going directly to prove the existence of a fact, gives rise to a logical inference that such [a] fact does exist." *McInnis v. State*, 61 So. 3d 872, 875 (¶11) (Miss. 2011) (citation omitted).  It is entitled to the same weight and effect as direct evidence.  *Sherrell v. State*, 622 So. 2d 1233, 1238 (Miss. 1993). "Circumstantial evidence need not exclude every possible doubt, but only every other reasonable hypothesis of innocence."  *Campbell v. State*, 798 So. 2d 524, 529 (¶13) (Miss. 2001) (citation and internal quotation marks omitted).  Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014) provides that murder is "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed . . . ."  The State was required to prove that Brooks killed Shivers, without the authority of law, and with deliberate design.  *Id*.

¶15.   Upon review of the record, we find there was sufficient evidence for a jury to find beyond a reasonable doubt that Brooks murdered Shivers.  In the days leading up to Shivers's death, Brooks told two people that he was going to kill Shivers.  There was testimony that Brooks had been following Amy and knew what Shivers looked like.  On the day of Shivers's death, Brooks tried to obtain a gun from two people in order to handle a problem concerning his wife and her boyfriend.  Brooks stated he only needed to use the gun one time.  There was also testimony that Brooks had a gun in his possession at 9:00 p.m. on the night of the murder.  Furthermore, two witnesses testified that Brooks attempted to use them as an alibi for the night of Shivers's murder.

6

¶16. Although Brooks's theory of defense was that several burglaries in the area could have been related to Shivers's death, the evidence he produced to prove this theory was vague at best. The jury clearly found this theory was not reasonable or credible. We also find no error with the trial court's denial of his peremptory instruction. This issue is without merit.

III.    NEW TRIAL

¶17. In his other issue on appeal, Brooks argues the trial court erred in denying his motion for a new trial. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush,* 895 So. 2d at 844 (¶18). We review the evidence in the light most favorable to the verdict, and we will not overturn the verdict unless we find that the trial court abused its discretion in denying the motion for a new trial. *Woodard v. State*, 765 So. 2d 573, 576 (¶16) (Miss. Ct. App. 2000) (citing *Veal v. State,* 585 So. 2d 693, 695 (Miss. 1991)).

¶18. Based upon our review of the evidence above, we cannot say that the weight of the evidence overwhelmingly supports setting aside the jury's verdict. This issue is without merit.

¶19. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**