# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-KA-01588-SCT

*RODERIC LEON THEODORE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/12/1998 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONALD A. SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/10/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/31/2001 |

**BEFORE BANKS, P.J., SMITH AND MILLS, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Roderic Leon Theodore was tried before a Harrison County Circuit Court jury for the murder of Rodney Crenshaw. Theodore was found guilty of murder and was given a life sentence in the custody of the Mississippi Department of Corrections. Aggrieved by that judgment, Theodore appeals to this Court.

## FACTS AND PROCEEDINGS BELOW

¶2. In the early morning hours of July 11, 1997, Gulfport Police Officer Robert Curry, was called to the scene of a motor vehicle accident. When Officer Curry arrived, he found a wrecked Geo Tracker flipped on its driver's side. A black male was lying in the vehicle across the door frame. Officer Curry testified that another officer checked the man for a pulse. The man did not have one. Officer Curry also observed what appeared to be a bullet hole in the man's left arm around the elbow area.

¶3. Kevin Howard, a paramedic for American Medical Response, arrived at the scene. He also noticed a Jeep that was flipped on the driver's side with a partially ejected man. The man was identified as Rodney Crenshaw. Howard testified that the man was "pulseless, anaptic, and was not breathing." Crenshaw was lying in a pool of blood and was pronounced dead at the scene.

¶4. Keith Johnson, a forensic crime scene analyst for the Gulfport Police Department, was also called to the scene. He testified that he photographed the scene with a 35mm camera. One of Johnson's fellow officers completed a rough sketch diagram which gave the measurements and actual locations of items that were identified at the scene. Officer Johnson also testified that he made a videotape of the scene for the purpose of providing a three-dimensional view of the crime scene. The defense objected to the video footage that

showed the body of the deceased in a gruesome position. The defense argued that this portion of the tape was also cumulative because still pictures of the same scene were already admitted into evidence. To this objection, the State argued that the scene was only a few seconds in length and that it was not particularly gruesome. It argued that the purpose of the video was to orientate the jury as to the scene of the crime. The court held that the video tape was admissible because it was the best way to depict the scene of the crime. During the testimony of Officer Johnson, the videotape was played for the jury.

¶5. Officer Johnson also examined the vehicle and identified some of the damage as bullet holes. Also, a projectile was found underneath the carpeting of the vehicle on the driver's side.

¶6. Erica Brock testified that she had been a passenger in the vehicle with Crenshaw. She testified that another woman, Renee Williams, snatched some CDs from Crenshaw and ran up the stairs of the apartment. This is when the dispute over these CDs began.

¶7. Joyce Bell, a resident in an apartment over Martin's Lounge, testified that someone known as "Baby Boy" was sitting outside on the balcony. Bell then identified Roderic Theodore in the courtroom as the man she referred to as "Baby Boy." She testified that Renee Williams, another young man, whom she could not identify, and Dave the butcher were arguing over CDs on the balcony outside her apartment door. She did testify that the young man, whom she could not identify, was not Theodore, but someone else.[1] She testified that this dispute continued downstairs and that Theodore was not a part of this argument. Theodore remained on the balcony. She then testified that Crenshaw walked around the side of the building and then pulled his jeep to the front of the building. There were still words being exchanged between Renee, Dave, and Crenshaw.

¶8. At this point, Crenshaw, who was in his jeep, stated "I want my disks back. Y'all are going to give me my disks. You can bet this everything and you can bet it on the six. Y'all going to give me my disks." After the young man stated this, Theodore pulled out a gun and started shooting from the balcony into the top of the jeep. Bell testified that Crenshaw was not talking to Theodore nor was he looking in the direction of Theodore. She also testified that she never saw Crenshaw with a weapon.

¶9. Dr. Paul McGarry, a forensic pathologist, performed an autopsy on Rodney Crenshaw's body on July 13, 1997. He testified that Crenshaw's death was caused by a gunshot wound that went in his back, through his left lung, through his heart, made large holes in the heart and in the blood vessels of the lungs. This caused a massive internal hemorrhage.

¶10. A stipulation was entered into the record. That stipulation was that the casings and projectiles were examined by forensic scientist John Franovich. The casings and the projectiles were fired from the gun that was found in the place where Theodore was staying.

¶11. Theodore testified on his own behalf. He stated that he obtained the gun on the day of the accident from a white male. He testified that he heard a lot of arguing going on and then saw a Geo Tracker approach. Theodore stated that he asked Crenshaw, who was driving the Tracker, to leave from in front of the building. Theodore testified that Crenshaw accused him of having his CDs and making threats about them. According to Theodore, Crenshaw told him that he was going to "straighten him." In this area, Theodore stated that means he was going to kill him. Next, Crenshaw told Theodore that he would put that "on the six." According to Theodore, that means that Crenshaw made the threat "on this oath." In other words, after he said this, he would have to kill Theodore. At this point, Theodore testified that Crenshaw

reached under his hat. According to Theodore's testimony, he thought Crenshaw had a gun. Theodore watched Dave back up which made him very afraid and added to his suspicion that Crenshaw had a gun.

¶12. At this point, Theodore pulled a gun from his pants and begin shooting in the direction of Crenshaw. He testified that he never intended to kill him, he was only trying to scare him. After Theodore shot at Crenshaw, Crenshaw attempted to drive away but wrecked. Theodore ran down the stairs, got into his father's car, and drove away. The gun was found behind a water heater in a storage room in the home of Theodore's father. Theodore testified that he was staying with his father at this time. The gun had been wrapped in a plastic baggy.

¶13. When Theodore was first questioned by the police, he denied knowing anything and told them that he was not involved. He later changed his story and told the police that it was all a big accident.

¶14. A jury found Roderic Theodore guilty of the murder of Rodney Crenshaw. He was given a life sentence in the custody of the Mississippi Department of Corrections.

¶15. Theodore raises the following issues on appeal:

**I. WHETHER THE LOWER COURT ERRED IN GRANTING AN INSTRUCTION ON DELIBERATE DESIGN?**

**II. WHETHER THE LOWER COURT ERRED IN ALLOWING THE INTRODUCTION OF THE ACCIDENT SCENE VIDEOTAPE IN ITS ENTIRETY?**

**III. WHETHER THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO FIND THE DEFENDANT GUILTY OF MURDER?**

**IV. WHETHER THE LOWER COURT ERRED IN NOT GRANTING DEFENDANT'S DIRECTED VERDICT, OR IN THE ALTERNATIVE, HIS MOTION FOR A NEW TRIAL?**

**V. WHETHER THESE ERRORS REQUIRE REVERSAL?**

## DISCUSSION

¶16. This Court's standard of review in reviewing jury instructions is as follows: In determining whether reversible error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. *Fielder v. Magnolia Beverage Co.*, 757 So.2d 925, 929 (Miss.1999).

¶17. Next, this Court's standard of review in regards to a directed verdict is the same as a judgment notwithstanding of the verdict. *Sullivan v. State*, 749 So.2d 983, 993 (Miss. 1999) (citing *Gleeton v. State*, 716 So.2d 1083, 1087 (Miss. 1998)). The standard for a directed verdict is as follows:

> Once the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that given the evidence, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty.

*Ashford v. State*, 583 So.2d 1279, 1281 (Miss. 1991).

¶18. A motion for a new trial carries a different standard of review. A motion for a new trial asks that the jury's guilty verdict be vacated on grounds related to the weight, not sufficiency, of the evidence. *May v. State*, 460 So.2d 778, 781 (Miss. 1984). This Court will not order a new trial unless convinced that the verdict is so overwhelmingly against the

weight of the evidence that unconscionable injustice exists. *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983). Lastly, "the Supreme Court will reverse the lower court's denial of a motion for new trial only if, by denying, the court abused its discretion." *Gleeton*, 716 So.2d at 1088.

## I. WHETHER THE LOWER COURT ERRED IN GRANTING AN INSTRUCTION ON DELIBERATE DESIGN?

¶19. Theodore argues that the court granted both a deliberate design instruction (S-2) and a manslaughter instruction (D-11) and this constituted an incompatibility between the two. Theodore cites to *Windham v. State*, 520 So.2d 123 (Miss. 1987) where this Court held that the deliberate design instruction was erroneous. In that case, the State was granted an instruction that stated deliberate design could be formed "at the very moment" of the fatal beating. *Id.* at 125. This Court held that instruction conflicted with the manslaughter instruction which defined manslaughter as the willful, felonious killing of a human being, without malice in the heat of passion, by the use of a dangerous weapon, without authority of law and not in necessary self-defense. *Id.* at 125. The controversial language in the deliberate design instruction in that case was "at the very moment."

¶20. The Court held that the words "deliberate" and "design" have general and accepted meanings. *Id.* at 126. As defined in dictionaries, "deliberate" indicates full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences. *Id.* At the same time, "design" means to calculate, plan, and contemplate. *Id.* For these reasons, this Court held that while deliberate design can be formed very quickly, and perhaps moments before, it is a contradiction in terms to say that deliberate design can be formed "at the very moment" of the fatal act. *Id.* The Court stated that the language in the instruction "at the very moment" improperly ruled out any possibility of manslaughter. Therefore, this Court reversed on that error.

¶21. The case sub judice is distinguishable from *Windham*. Here, Jury Instruction S-2 provided:

> The Court instructs the Jury that deliberate design as used elsewhere in these instructions, means intent to kill, without authority of law and not being legally justifiable or legally excusable.
>
> A deliberate design *cannot* be formed at the very moment of the fatal act, however, the deliberate design need not exist in the mind of the Defendant for any definite time, not for hours, days, or even minutes, but if there is deliberate design, and it exists in the mind of the Defendant but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of Murder.

(emphasis added).

¶22. The jury instruction here specifically stated that deliberate design cannot be formed at the very moment of the fatal act. For this reason, the problem that existed in *Windham* does not exist here. These cases are

distinguishable; and therefore, *Windham* does not apply to the facts of this case.

¶23. In *Carr v. State*, 655 So.2d 824, 847 (Miss. 1995), this Court held that a similar jury instruction on deliberate design did not involve the "at the very moment of the fatal act" problem. This Court held that there was no flaw in the instruction given on deliberate design as it specifically stated that deliberate design could not be formed at the very moment of the fatal act. *Id.* at 847. For this reason, this Court held that the pitfall of *Windham* was therefore avoided. *Id.*

¶24. This Court concludes that the facts of this case are more closely related to the *Carr* decision. Jury instruction S-2 did not contain the "at the very moment" language. To the contrary, the instruction specifically noted that deliberate design cannot be formed at the very moment of the fatal act. For this reason, this instruction did not preclude the possibility of manslaughter as in *Windham*. Accordingly, this issue is without merit.

## II. WHETHER THE LOWER COURT ERRED IN ALLOWING THE INTRODUCTION OF THE ACCIDENT SCENE VIDEOTAPE IN ITS ENTIRETY?

¶25. Theodore next asserts that the trial court erred by allowing the introduction of the accident scene videotape in its entirety. Specifically, Theodore alleges that the videotape of the crime scene did not add anything to the "story." Theodore also alleges that the video did not help in corroborating the testimony of any witnesses. For instance, Theodore asserts that the intention of the State was to "arouse the passion and prejudice of the jury." At trial, Theodore objected to the body of Rodney Crenshaw being shown on the videotape.

¶26. The State submits that the introduction of the videotape was not in error. The State argues that the scene of the flipped tracker and the victim were more probative than prejudicial. The video provided a three dimensional view of the scene as originally viewed by the investigating officers and was therefore a valid aid for the jury. The State points out that the videotape helped corroborate the testimony of several witnesses. The State also pointed out at trial that the portion of the tape which showed Crenshaw was approximately 3 seconds in length. It argues this to support the proposition that there was no prejudice to Theodore and, if so, the probative value outweighed any such effect.

¶27. This Court has held that the same standards used in determining the admissibility of photographs are applicable to the admission of videotapes. *Walters v. State*, 720 So.2d 856, 861 (Miss. 1998) (citing *Underwood v. State*, 708 So.2d 18, 33 (Miss. 1998)). Applying that standard, the admissibility of photographs is within the sound discretion of the trial judge. This discretion will be upheld absent abuse of discretion. *McFee v. State*, 511 So.2d 130, 134 (Miss. 1987) (citing *Watson v. State*, 483 So.2d 1326, 1328 (Miss. 1986)). This Court has also held that "[t]he discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So.2d 1329, 1335 (Miss. 1994). "A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose." *Lanier v. State*, 533 So.2d 473, 484 (Miss. 1988).

¶28. Here, the videotape was introduced during the testimony of Officer Keith Johnson, a forensic scientist employed by the Gulfport Police Department. Outside the presence of the jury, the judge heard both parties' arguments regarding the admissibility of the videotape. A monitor was brought into the court room, and the videotape was played for the judge and the parties. The jury was still excused at this point. The

defense counsel objected to the portion of the videotape that showed Crenshaw lying in the door of the overturned jeep. Defense counsel argued that this was cumulative and prejudicial. The State argued that the total tape was only 3 minutes long and that Crenshaw's body was only shown for a few seconds of that time. The State also argued that its purpose was to orientate the jury to the scene of the accident and the shooting, and it corroborated the testimony of several witnesses. After weighing the probative value against the prejudicial effect of the tape, the court held that the videotape would be admissible due to its depiction of exactly what the Officer saw upon arrival to the scene of the crime. The jury then reentered the courtroom.

¶29. As earlier mentioned, "[a] photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose." *Lanier v. State*, 533 So.2d at 484. Again, the trial judge has sound discretion in the admissibility of photographs absent the abuse of discretion. *Watson v. State*, 483 So.2d at 1328. The trial judge was careful in his determination of the admissibility of the videotape. For example, the judge conducted a hearing, outside of the presence of the jury, and weighed the probative value against the prejudicial effect. For this reason, this conduct does not rise to the level of abuse of discretion; therefore, the decision was within the judge's sound discretion and will not be overturned on appeal.

### III. WHETHER THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO FIND THE DEFENDANT GUILTY OF MURDER?

¶30. Theodore argues that due to the gang language used by Crenshaw, he was fearful for his life. Theodore also alleges that the testimony of the State's witnesses was such that no reasonable juror could have found him guilty. The State disputes Theodore's allegations citing numerous places in the record where witnesses provided sufficient evidence through their testimony.

¶31. Conflict in the evidence is for the jury's resolution. *Hyde v. State*, 413 So.2d 1042, 1044 (Miss. 1982). Theodore testified that he was fearful for his life because Crenshaw threatened him by using gang language. After this threat, Theodore pulled out a gun and began shooting at Crenshaw. The State rebutted Theodore's testimony with the testimony of Joyce Bell. Joyce Bell was a resident in the apartment complex where the incident took place. She was on the balcony beside Theodore when he began shooting at Crenshaw. She testified that Theodore had been sitting down during the altercation between the other men. He was not involved in the dispute. She testified that Crenshaw was not talking to Theodore when Theodore pulled a gun from his pants and began firing.

¶32. The sufficiency of the evidence was viewed and tested in the light most favorable to the State. *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993). This Court is required to reverse only where, "with respect to one or more of the elements of the offense charged, the evidence considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Id*. (citing *Wetz v. State* 503 So.2d 803, 807 (Miss. 1987)).

¶33. Additional evidence in the record proves sufficient to uphold the verdict of guilty. Erica Brock had been a passenger in the jeep with Crenshaw before the incident took place. She testified that Crenshaw did not have a weapon nor did he make any threats during the altercation. Brock also testified that Crenshaw remained in his jeep the entire time.

¶34. As earlier mentioned, Joyce Bell testified that Theodore was not a part of this altercation. She also

stated that Crenshaw was not speaking to Theodore nor was he even looking in the direction of Theodore at the time of the shooting.

¶35. Roderic Theodore testified that he purchased the gun earlier that afternoon from an unidentified white male. Theodore admitted to pulling the gun from his pants and firing shots at the deceased Crenshaw. He testified that Crenshaw was speaking gang language, and he was fearful for his life.

¶36. From a thorough review of the record, this Court finds that there was sufficient evidence in the record to convict Theodore of murder. As earlier stated, the sufficiency of the evidence is viewed and tested in the light most favorable to the State. *McLain v. State*, 625 So.2d at 778. This Court is required to reverse only where, "with respect to one or more of the elements of the offense charged, the evidence considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Id.* (citing *Wetz v. State* 503 So.2d at 807). If the jury accepted the above testimony as true, there was sufficient evidence in the record to convict Theodore of murder.

### IV. WHETHER THE LOWER COURT ERRED IN NOT GRANTING DEFENDANT'S DIRECTED VERDICT, OR IN THE ALTERNATIVE, HIS MOTION FOR A NEW TRIAL?

¶37. The fourth issue raised by Theodore is whether the trial court erred in denying his motion for a directed verdict or, in the alternative, his motion for a new trial. In *McClain v. State*, 625 So.2d at 778, McClain made three challenges. The challenges alleged were motion for a directed verdict, request for peremptory instruction, and a motion for JNOV. This Court held that all of these challenges question the legal sufficiency of the evidence. The Court held that "[t]he credible evidence consistent with McClain's guilt must be accepted as true." *Id.* (citing *Spikes v. State*, 302 So.2d 250, 251 (Miss. 1974)). Again, the Court reiterated that we will only reverse if reasonable jurors could only find the accused not guilty. *Id.* Again, conflicts in evidence are for the jury's determination. *Hyde*, 413 So.2d at 1044.

¶38. The sufficiency of the evidence issue as discussed in Issue III is clearly without merit. The evidence in the record is sufficient to return a guilty verdict for murder.

### V. WHETHER ERRORS REQUIRE REVERSAL?

¶39. Theodore argues that errors at trial, although not individually, cumulatively require reversal. First, the jury instruction on deliberate design did not include the "at the very moment" language that has been held as troublesome with a manslaughter instruction. In fact, the instruction specifically stated that deliberate design could not be formed at the very moment of the fatal act. Next, this Court has held that the same standard that applies to the admission of photographs applies to the admission of videotapes. The admissibility is within the sound discretion of the trial judge unless it can be determined that he abused his discretion. Lastly, Theodore raises sufficiency of the evidence claims. The testimony of witnesses in the record is sufficient to uphold the murder conviction.

### CONCLUSION

¶40. For the foregoing reasons, the conviction of murder and the life sentence of Roderic Theodore is affirmed.

¶41. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE**

**CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN, C.J., MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. BANKS, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J. AND WALLER, J., EASLEY, J., JOINS IN PART.**

**BANKS, PRESIDING JUSTICE, CONCURRING:**

¶42. I reluctantly concur in the Court's affirmance of this judgment. I adhere to the view expressed by the dissent in *Fears v State*, No. 97-CT-00558-SCT, 2000 WL 863177, at *5-*7 (Miss. 2000) (Waller, J., dissenting), with regard to the deliberate design instruction. In my view, the instruction in this case is slightly, but not sufficiently, better. I, nevertheless, agree to affirm recognizing that the Court has spoken on the matter in *Fears*.

**McRAE, P.J., AND WALLER, J., JOIN THIS OPINION. EASLEY, J., JOINS IN PART.**

1. The evidence later identified this unidentified man as Rodney Crenshaw.