# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-00495-SCT

*GREGORY SHIPP*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/2002 |
| TRIAL JUDGE: | HON. GEORGE B. READY |
| COURT FROM WHICH APPEALED: | DeSOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM F. TRAVIS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/05/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, P.J., CARLSON AND GRAVES, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Having been indicted, tried, convicted and sentenced for murder, Gregory Shipp (Shipp) appeals from the final judgment of the Circuit Court of DeSoto County, claiming that the circuit court erred in denying his motion for directed verdict at the close of the State's case-in-chief. Finding the trial court properly denied the motion for directed verdict and properly submitted the case to the jury, we affirm the judgment of the circuit court.

## STATEMENT OF THE CASE

¶2.     On October 11, 2001, Gregory Shipp was indicted for the murder of George Hailey (George) pursuant to Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2000). Shipp was convicted of murder in the Circuit

Court of DeSoto County on February 11, 2002, and was sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections. After his motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial was denied, Shipp timely appealed to this Court raising only one issue for consideration: Whether the trial court erred by denying the motion for directed verdict at the close of the State's case in chief.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶3.     On August 4, 2001, George Hailey was shot and killed by Gregory Shipp. After being indicted for murder, Shipp's trial commenced on February 11, 2002, before a DeSoto County Circuit Court jury, Judge George B. Ready, presiding.

¶4.     The State called Marilyn Abram (Marilyn), girlfriend of George Hailey and mother of his child, to testify.  Marilyn, also the sister-in-law of Shipp,[1] testified that George had purchased a car from Shipp and that George still owed Shipp approximately $125.00 for the car. Marilyn stated she had offered to pay George's remaining debt owed on the car, and Shipp accepted her offer by stating "everything is squash," which Marilyn understood to mean if George did not pay, Shipp would collect from her. Marilyn also testified she never heard Shipp threaten George in her presence.

¶5.     Milton Abram (Milton), Marilyn Abram's brother and Gregory Shipp's brother-in-law, testified that on August 4, 2001, he and his cousin Henry Morgan were living at 1565 Hailey Road, Southaven, MS. Milton stated his residence was across the street from the home of Robert Lee and Bobby Jean Hailey. He stated he saw both Shipp and George at his house that night. Milton testified George was sitting in his driveway in Marilyn's car when Shipp approached George and asked him to get out of his car. When George refused to get out of his car, Shipp told George, "You better not be here when I get back." Milton

_____

[1]Gregory Shipp was married to Marilyn's sister, Rhonda Vanessa Shipp.

testified that after Shipp's statement to George, Shipp went to his house which was right next door to Milton's home. Milton attempted to get George to accompany him to Bobby Jean Hailey's house, but George never got out of his car. Milton did not go back outside until after he heard the gunshot. Milton also testified that earlier on August 4, he had traveled to Tennessee at the request of his sister, Marilyn, to retrieve her car from George. While he was in Tennessee, Milton stated he saw that George had a knife in his car, but he testified that he never saw George pull his knife on Shipp.

¶6.     Henry Morgan (Morgan) testified he was living with his cousin, Milton Abram, on August 4, 2001. The first time Morgan saw Shipp on August 4, Morgan was on his porch with Sly Payne and Tonya Polk when Shipp arrived at his house. Shipp stated he had just been in an argument with George about the money George owed him. Morgan testified Shipp was carrying a sawed-off, pump action shotgun. Morgan testified that Shipp stated he "had something for George" if he came on Hailey Road. Morgan also testified that Tonya Polk fired Shipp's shotgun into the air. Later that evening, George arrived at Morgan's home. Morgan stated that George first pulled into his driveway but then drove to Bobby Jean Hailey's driveway. Shipp followed George to Bobby Jean's house. Morgan testified that Shipp returned to his house and came back with the sawed-off shotgun. Shipp walked over to George's car and asked him to roll down the window, but George refused. Morgan testified when George pulled off in his car, Shipp fired the gun. After he shot George, Shipp "got in the car and he took off real fast." George's car rolled down the hill into the wooded area of the yard.

¶7.     Tonya Polk (Polk) testified that she saw Shipp the afternoon of August 4, 2001. Polk, Morgan and Sly Payne were sitting on Morgan's porch when Shipp pulled up to the house and informed the group that he and George had exchanged words about the money that George owed him. Later that afternoon, Polk stated Shipp returned to Morgan and Milton's house with a shotgun. Polk stated Shipp allowed her to test

3

fire the gun. On the night of August 4, George and Milton arrived at Milton's home together in George's car. Milton got out of the car and attempted to get George to follow him into the house, but George never left his vehicle. Polk then saw Shipp pull up by George and ask George to get out of the car. After George refused, Milton approached the two men and asked George to accompany him to Robert Lee Hailey's house. As Milton walked across the street to Robert Lee Hailey's house, George followed Milton in his car. Polk testified that before George left, Shipp told him, "Don't be here when I get back." Shipp left and went home. However, Shipp soon returned. Polk testified that as George saw Shipp approaching his car, he started blowing his horn. While this was occurring, Polk was talking on her cell phone to Bobby Jean Hailey. Polk told Bobby Jean to tell Robert Lee to come outside because Shipp had come back and was about to kill George. Polk saw Shipp exit his car and walk to George's car. Shipp was again demanding that George get out of his car. Polk testified that she saw Shipp carrying a gun when he approached George's car. When George would not get out of the car, Polk heard three "pecks" as Shipp hit the driver's side window with his gun. After Shipp hit the window, George pulled away. Polk testified that Shipp stepped back and fired the gun. After shooting George, Shipp left in his car.

¶8. Bobby Jean Hailey (Bobby Jean), wife of Robert Lee Hailey, testified that her sister, Marilyn, and George have a child together - Angela. Occasionally Bobby Jean and Robert Lee would babysit Angela, and they were, in fact, babysitting Angela on the night of August 4, 2001. Bobby Jean also stated it was not uncommon for George to pick up Angela when Marilyn was unable to do so. Bobby Jean testified she received a telephone call from Polk on the night of August 4. Bobby Jean stated Polk asked for Robert Lee because Shipp and George were "into it outside" and Shipp had a gun. Bobby Jean testified that while she was on the phone with Polk she could hear a horn blowing outside. As Bobby Jean was getting Robert Lee out of bed, she heard a shot and a car driving away very fast. She called 911 as Robert Lee went outside.

4

¶9. Robert Lee Hailey (Robert Lee), George's first cousin, testified that on the night of August 4, 2001, he was in his bedroom watching TV when he heard his wife screaming that someone had been shot outside. He got up and ran out of the side door of his house and noticed a white car down the hill in some weeds. Robert Lee testified that he ran down the hill, but because it was too dark, he could not see inside the car. Robert Lee asked someone to bring his flashlight from his truck, and he ran back down the hill to George's car. Robert Lee testified as he approached the car, he saw George slumped over. Robert Lee yelled for someone to call 911 after George failed to respond to his name. Robert Lee testified when he found George's body in the car, he did not notice a knife in his hands. Within a couple of minutes, the police arrived at the crime scene.

¶10. Tommy Jones, a lieutenant with the Southaven Police Department (SPD), responded to the call on Hailey Road on August 4, 2001. Upon arriving at the crime scene, Lt. Jones noticed a white Neon at the rear of the residence. As Lt. Jones approached the vehicle, he noticed "a man laying over in the vehicle. . .bleeding from approximately the rear of the head." Lt. Jones noticed the car was in reverse and was still running. The driver's door was locked, but Lt. Jones was able to reach through the window of the rear door, which had shattered, to unlock the door. As other SPD officers were dispatched to the scene, Lt. Jones directed Officer Brent Vickers to photograph the scene.

¶11. Officer Vickers began taking initial photographs of the crime scene. He noticed that the vehicle's backup lights were still on. Officer Vickers observed George "slumped over in the vehicle in the driver's seat leaning towards the passenger seat." Officer Vickers also observed blood on George's head and neck and blood splatter on the dashboard. Officer Vickers was also made aware of glass fragments in the driveway. Officer Vickers was also involved in the recovery of the weapon used in the shooting. The weapon was found at the intersection of Tchulahoma Road and Stateline Road. Officer Vickers testified

5

that Shipp voluntarily turned himself in to the authorities and informed them where he had thrown out the gun.

¶12.     Ronnie Noe, an officer for the SPD, was also on duty the night of August 4, 2001, and responded to the emergency call. Officer Noe, who was in charge of taping off the crime scene, discovered the glass from the broken window in the driveway. Officer Noe testified when George's body was removed from the car, he found a knife in George's seat. When he returned to the SPD, Officer Noe was asked by Detective Mark Little to be present while Shipp was given his *Miranda* warnings. Officer Noe also observed Det. Little's interview with Shipp.  Shipp informed the SPD that the gun used to shoot George was in a field at the corner of Tchulahoma Road and Stateline Road.

¶13.     Detective Mark Little was not on duty the night of August 4, 2001, but he was called out to the crime scene on Hailey Road.  Det. Little also testified that a knife was found in George's car. The knife, which was closed, was found at the edge of the seat behind George. Det. Little returned to the SPD to question Shipp regarding his involvement in this crime.  Det. Little read and explained Shipp's *Miranda* rights to him. Det. Little testified that Shipp gave a statement as to the location of the shotgun used in the shooting.  Upon finding the gun in the location revealed by Shipp, Det. Little also found a 12 gauge Winchester shotgun shell casing in the chamber of the shotgun. When asked about Shipp's statement, Det. Little testified that Shipp stated he and George had recently had an argument about a car that Shipp had sold to George.  George was supposed to pay Shipp $50.00 a month, but George "had been dodging him and not paying him."  Det. Little testified that Shipp stated he did confront George about the money which was owed and that he did have a gun in his possession during the confrontation. Shipp stated that during their argument George said, "F you. I will kill you."  Shipp informed Det. Little that he saw a knife in George's car.  Shipp claimed to have seen the blade of George's knife although Det. Little found the knife

closed "on the driver's seat behind [George's] left pants pocket." Det. Little testified that a person would not be able to see the knife in the car where it was located unless they stuck their head in the car and looked for it. Det. Little testified when he arrived on the scene all the doors were closed and locked and all the windows were rolled up, save for the one which was broken from the shotgun blast. Det. Little testified that Shipp stated that "when George put the car into gear and went to pull off, that the gun accidentally went off." Shipp apparently left the scene because he was scared of the police.

¶14.    Jeffrey Pounders, DeSoto County Coroner, sent George's body to Jackson for an autopsy because his death was thought to be a homicide. Dr. Steven Hayne, an accepted expert in the field of forensic pathology, performed the autopsy. Dr. Hayne discovered the presence of an entrance gunshot wound located immediately behind George's left ear. Dr. Hayne also noted secondary wounds on "the back part of the neck, the upper part of the left side of the back and coursing across the entrance wound site" which were consistent with shot pellet and glass. Dr. Hayne testified that the shot was fired at a downward angle into George's head. In other words, Dr. Hayne's findings were consistent with Shipp standing above George and aiming the shotgun at George while George was in his car. Dr. Hayne also testified that based on the photographs he was shown of George's body in the car and his findings during his postmortem examination, "[George] had his head turned slightly to [Shipp] and left, and in addition he had the trunk of his body turned slightly to the right. . . ." Based on his examination, Dr. Hayne determined the cause of George's death to be a shotgun wound to the head.

¶15.    The State rested. At the close of the State's case in chief, the defense moved for a directed verdict on the grounds that the State failed to present a prima facie case of murder. The trial judge denied the defense's motion, and the defense proceeded with its case in chief.

¶16.    Gregory Shipp, the only witness called by the defense, testified that on the night of August 4, 2001, he ran into George on his way to visit his brother-in-law in Memphis. George informed Shipp that he had recently lost his job and, therefore, would not be able to pay Shipp the $50.00 per week that he owed him. Shipp testified that George then "snapped" and pulled a knife on him. Shipp then went back home where he saw Henry Morgan, Tonya Polk and Sly Payne next door on the porch. Tonya stated she wanted to buy a gun because of recent reports of a Peeping Tom. Shipp informed Tonya that he had a shotgun that she could buy. Shipp retrieved the gun from his house and allowed Tonya to test fire the weapon. Shipp testified that he threw the gun in his car upon seeing Bobby Jean Hailey because he did not want to disrespect her. Milton Abram then pulled up and stated that he was going to find George because he had taken Marilyn's car. Shipp testified that he decided to join Milton, Polk and Sly Payne in trying to locate George. They found George in Memphis. Shipp testified that while Milton was trying to talk to George, George pulled a knife on him. The group left but stopped at a gas station where George and Shipp got into an argument. Shipp left and drove around before returning home where he found George at Milton's house. Shipp testified that George threatened him with a knife, so Shipp went to Robert Lee's home. Upon arriving at Robert Lee's house, Shipp saw the car George had recently been driving. Because Shipp was scared and because of the previous confrontations with George, he grabbed his gun as he exited his car. Shipp testified that he heard Tonya say, "George, Greg got his gun," and then he saw George coming toward him. George then ran to his car, and Shipp ran towards the back part of the house. Shipp then heard the car coming towards him, and he jumped out of the way. Shipp testified when he tried to run, the gun fired. Shipp left because he was scared, but he immediately went to his sister's house and told her what had happened. His sister convinced him to call the police. Shipp voluntarily turned himself into the SPD.

8

¶17. The defense rested, and the State offered no rebuttal witnesses. The defense renewed its motion for a directed verdict, but the trial court denied the motion.

¶18. The jury found Shipp guilty of murder, and the trial judge sentenced Shipp to life in prison. The trial court denied Shipp's motion for a JNOV or, in the alternative, a new trial. Shipp timely filed this appeal.

### DISCUSSION

¶19. Shipp argues the trial court erred by denying his motion for a directed verdict at the close of the State's case-in-chief. However, the trial court also denied Shipp's renewed motion for a directed verdict after the State finally rested upon the completion of the trial and Shipp's post-trial motion for a JNOV or, in the alternative, a new trial. Therefore, although Shipp only cites error as to the denial of his motion for directed verdict at the conclusion of the State's case in chief, this Court will review this issue as a challenge to the sufficiency of the evidence produced at trial.

¶20. Because motions for directed verdicts and JNOV motions require "consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993). *See also Wetz v. State*, 503 So.2d 803, 807-08 (Miss. 1987). Here, this occurred when the trial court denied Shipp's motion for JNOV. This Court's standard of review regarding the sufficiency of evidence is well-established.

> In appeals from an overruled motion for JNOV the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. *Esparaza v. State*, 595 So.2d 418, 426 (Miss. 1992); *Wetz*, at 808; *Harveston v. State*, 493 So.2d 365, 370 (Miss. 1986); *May v. State*, 460 So.2d 778, 780-81 (Miss. 1984); *Callahan v. State*, 419 So.2d 165, 174 (Miss. 1982). The credible evidence consistent with [the defendant's] guilt must be accepted as true. *Spikes v. State*, 302 So.2d 250, 251 (Miss. 1974). The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Wetz*, at 808; *Hammond v. State*, 465 So.2d 1031, 1035 (Miss. 1985); *May*, at 781. Matters regarding the weight and credibility of the evidence are to be resolved by the jury. *Neal v. State*, 451 So.2d 743, 758 (Miss. 1984); *Gathright v. State*, 380 So.2d 1276, 1278 (Miss. 1980). We are authorized to reverse

9

only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. *Wetz*, at 808; *Harveston*, at 370; *Fisher v. State*, 481 So.2d 203, 212 (Miss. 1985).

*McClain*, 625 So.2d at 778.

¶21.    Shipp argues that the State failed to present a prima facie case of murder, in that the State did not offer sufficient proof of malice aforethought, premeditated design or deliberate design.  Shipp concedes the case law of this State holds that malice aforethought, premeditated design and deliberate design all convey the same meaning.  *See Windham v. State*, 602 So. 2d 798, 801-02 (Miss. 1992) (*Windham II*). However, Shipp contends that while premeditation connotes a prior desire to kill and must involve an "appreciable time for reflection and consideration" before committing the murder, *Blanks v. State*, 542 So. 2d 222, 226-27 (Miss. 1989), finding that a deliberate design can be formed at the very moment of the commission of the fatal act is contrary to the appreciable time requirement.  *Windham v. State*, 520 So. 2d 123, 126 (Miss. 1987) (*Windham I*).

¶22.    Shipp was charged with murder pursuant to Miss. Code Ann. § 97-3-19(1)(a) which provides:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>> (a) When done with *deliberate design* to effect the death of the person killed, or of any human being. . . .

(emphasis added). "It has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing." *Johnson v. State*, 475 So.2d 1136, 1139 (Miss. 1985). *See Dye v. State*, 127 Miss. 492, 90 So. 180 (1921); *Hawthorne v. State*, 58 Miss. 778 (1881); *McDaniel v. State*, 16 Miss. (8 S. & M.) 401 (1847).

¶23.    This Court has established that it is error to give a deliberate design instruction which states the deliberate design was formed "at the very moment" of the fatal act because this instruction would rule out

10

the possibility of manslaughter. *See Windham I*. In *Windham I*, the case was reversed and remanded because the deliberate design instruction stated the deliberate design element could be formed "at the very moment" of the fatal act. 502 So. 2d at 126. The Court held this instruction eliminated the possibility that the defendant could have been found guilty of only manslaughter. *Id.* The Court found the deliberate design instruction to be in "hopeless conflict" with the manslaughter instruction. *Id.* at 126-27. *See also Smith v. State*, 463 So.2d 1028 (Miss. 1985); *Scott v. State*, 446 So.2d 580 (Miss. 1984); *Cooley v. State*, 346 So.2d 912 (Miss. 1977).

> By statute murder requires a "deliberate design to effect the death of the person killed." As defined by dictionaries the word "deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate. These are general and accepted meanings of these words.

> While it is no doubt true that a deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act.

*Windham I*, 520 So.2d at 126.

¶24. The instruction given in the case sub judice is the same instruction considered by this Court in *Theodore v. State*, 798 So. 2d 465, 470 (Miss. 2001). Instruction S-2 which was granted reads:

> Deliberate design, as used in these Instructions, means intent to kill without authority of law and not being legally justifiable, legally excusable, or under circumstances that would reduce the act to a lesser crime.

> A deliberate design *cannot be formed at the very moment of the fatal act*, however, the deliberate design need not exist in the mind of the Defendant for any definite time, not for hours, days or even minutes, but if there is deliberate design, and it exists in the mind of the Defendant but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of Murder.

11

(emphasis added). This Court held in *Theodore*, that even though the trial court granted both a deliberate design instruction and a manslaughter instruction, *Windham I* did not apply to the facts of the instant case. 798 So. 2d at 469-70. The jury instruction submitted by the State, which is identical to the jury instruction in the case sub judice, specifically stated deliberate design could not be formed at the very moment of the fatal act, and therefore, did not preclude the possibility of manslaughter. *Id.*

¶25. However, the facts of the case sub judice are slightly different from the above cases in that a manslaughter instruction was not given, nor was a manslaughter instruction requested by the defense. The only instruction submitted by the defense, which was granted over the objection of the State, stated as follows:

> The killing of a human being is an excusable homicide if the defendant's act which caused the death of George Hailey was a result of an accident or misfortune, in the heat of passion, upon any sudden and sufficient provocation.
>
> If George Hailey's death was caused by the discharge of the shotgun accidentally while in the possession of the defendant, and that Gregory Shipp was in the heat of passion and that in that Gregory Shipp's actions resulted from provocation, then the homicide was excusable.
>
> If you do find that the shooting was accidental and thus excusable, then you shall find for the defendant and return a verdict of NOT GUILTY.

¶26. The evidence in this case did not support a finding of heat of passion manslaughter. The knife was found under the victim's body, unopened. Shipp's own testimony was that he accidentally shot George when he was trying to run from George's car. The State's witnesses all testified that the argument between George and Shipp was one-sided. George refused to get out of his car, and he even started honking his horn for help when Shipp approached him. The evidence indicated George did not provoke or attack Shipp. Because it appears from the evidence that the defense raised by Shipp at trial was accident,

12

there is no reasonable factual scenario under which the jury may reasonably have concluded, [under the deliberate design instruction], that [the defendant's] premeditated design to kill, if any, existed in his mind but for an instant before the fatal act. On the prosecution's interpretation of the evidence, the premeditated or deliberate design existed well before the shooting. On the defense theory, it never existed. In this context, we declare the granting of [the deliberate design instruction] as harmless error. *Nicolaou v. State*, 534 So.2d 168, 173 (Miss. 1988).

*Blanks v. State*, 542 So.2d 222, 227 (Miss. 1989). *See also Catchings v. State*, 684 So. 2d 591, 595 (Miss. 1996) (Defense raised at trial was self-defense; therefore, the manslaughter instruction was not warranted and the giving of the deliberate design instruction was harmless error). Based on the record before us today, and based on the respective theories of the prosecution and the defendant, the trial judge appropriately instructed the jury.

¶27. Furthermore, as to the sufficiency of the evidence produced at trial, viewed in the light most favorable to the State, the evidence clearly supports the trial court's submission of the case to the jury and refusal to disturb the verdict. Tonya Polk testified that Shipp stepped back, raised his gun and then fired at George. Several witnesses overheard Shipp threaten George if he returned to Hailey Road. Dr. Hayne's testimony was consistent with Shipp standing over George and firing his weapon. Shipp's testimony to the contrary merely created an issue of fact for the jury.

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence–not just that supporting the case for the prosecution–in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. *See, e.g., Gavin v. State*, 473 So.2d 952, 956 (Miss. 1985); *May v. State*, 460 So.2d 778, 781 (Miss. 1984).

*McFee v. State*, 511 So.2d 130, 133-34 (Miss. 1987). *See also **Smith v. State***, 802 So. 2d 82, 85 (Miss. 2001); ***Mangum v. State***, 762 So.2d 337, 341 (Miss. 2000);***Garrett v. State***, 549 So. 2d 1325, 1331 (Miss. 1989). Based on the above standard, this Court finds substantial evidence in the record to support a verdict of guilty. Therefore, this assignment of error is without merit.

## CONCLUSION

¶28. The trial court properly denied Shipp's original motion for a directed verdict which was raised at the close of the State's case in chief. The trial court was also correct in denying the renewed motion for a directed verdict and submitting the case to the jury. After the jury returned a verdict of guilty, which was supported by substantial evidence, the trial court properly denied Shipp's motion for a JNOV or, in the alternative, a new trial. Because the State presented a prima facie case of murder and because the verdict of the jury was supported by substantial evidence, we affirm the judgment of the circuit court.

¶29. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, EASLEY AND GRAVES, JJ., CONCUR.**